ESTATE OF GEORGE S. HALAS, SR., DECEASED, VIRGINIA
H. MCCASKEY, AND MICHAEL R. NOTARO, CO-EXECUTORS,
ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 8438-88, 10163-89,     Filed April 11, 1990.
10164-89, 10165-89,
15748-89, 21879-89.

*James L. Malone III,* for the petitioners.
*Lawrence C. Letkewicz,* for the respondent.

## OPINION

HAMBLEN, *Judge:* This case is before the Court on the
motion for reconsideration of our opinion, T.C. Memo.
1989-536, filed by petitioner, Estate of Halas, Sr., pursuant
to Rule 161,[2] and the remaining petitioners' five motions in
limine filed October 27, 1989. In our opinion, we denied
petitioner's motion in limine to disqualify Willamette Man-
agement Associates, Inc. (hereinafter Willamette) as respon-
dent's expert witness.

We assume the following facts, as submitted by the
parties, for purposes of this ruling. Prior to 1981, the
Chicago Bears (hereinafter Old Bears) was an Illinois

---

[1]Cases of the following petitioners are consolidated herewith: McCaskey Family Holding Co.,
docket No. 10163-89; Stephen Halas, Inc., docket No. 10164-89; Christine Halas, Inc., docket
No. 10165-89; Anne-II Corp., Brian-II Corp., Edward-II Corp., Ellen-II Corp., George-II Corp.,
Joseph-II Corp., Mary-II Corp., Michael-II Corp., Patrick-II Corp., Richard-II Corp., and
Timothy-II Corp., docket No. 15748-89; and Virginia H. McCaskey, docket No. 21879-89. For
convenience the Estate of George S. Halas, Sr., shall be referred to as petitioner and the
petitioners in the consolidated cases shall be referred to collectively as petitioners.

[2]Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and
Procedure.

corporation. George Halas, Sr. (hereinafter Halas, Sr.), owned 49.35 percent of the Old Bears common stock, Halas Sr.'s son, George Halas, Jr. (hereinafter Halas, Jr.), owned 19.68 percent of the Old Bears common stock, and Halas, Sr.'s daughter, Virginia McCaskey, owned 19.68 percent. The remainder of the Old Bears common stock was owned by unrelated shareholders. Halas, Jr., predeceased his father in 1979.

In December 1981, the Old Bears was recapitalized and reorganized into a Delaware corporation and named The Chicago Bears Football Club, Inc. (hereinafter Chicago Bears or Bears). Common stock of the Old Bears was exchanged pro rata for stock in the reorganized Chicago Bears. Halas, Sr., received class B common stock equal to 49.35 percent ownership of the Bears. The Estate of Halas, Jr., and Virginia McCaskey each received 183 shares of class C common stock and class D common stock respectively equal to 19.68 percent ownership of the Bears. The unrelated shareholders received class A common stock equal to 11.29 percent of the Bears. Each of the four classes of common stock has equal voting rights and different liquidation and dividend rights. Each class of stock receives a different share of a residual dividend pool. Classes D and C stock share the same dividend priorities, the same number of shares outstanding, and the same liquidation and dissolution rights. However, class C common stock is entitled to a per-share annual cash dividend of $1,256. Class D common stock is entitled to a per-share annual cash dividend of $612.

Immediately after the recapitalization, Halas, Sr., transferred his class B common stock in the Bears to a newly organized Delaware corporation, the Halas Family Holding Co. (HFHC), in exchange for 7,143 shares of preferred stock with a stated value of $7,143,000, and a $1 million debenture bearing an interest rate of 17.5 percent due in the year 2001. HFHC immediately issued 9,100 shares of its common stock to 13 separate corporations, each wholly owned by one of 13 trusts organized and maintained for the benefit of Halas, Sr.'s 13 grandchildren. Eleven of the grandchildren are Virginia McCaskey's children, and two are Halas, Jr.'s children. A few days after these transac-

tions, HFHC acquired a 49.35-percent interest in a partnership formed to construct and own skyboxes at Soldiers Field, Chicago, Illinois, where the Bears play their home games. In a similar transaction, Virginia McCaskey transferred all of her class D common stock in the Bears to the McCaskey Family Holding Co. (MFHC), in exchange for preferred stock in MFHC and a promissory note. The common shareholders of MFHC were the 11 corporations owned by trusts maintained for the benefit of Virginia McCaskey's children. These 11 corporations were merged into MFHC in 1986. Thereafter, MFHC owned 84.6 percent of the common stock of HFHC and the other common shareholders of HFHC were Stephen Halas, Inc., and Christine Halas, Inc.

As a consequence of these transactions, all of the outstanding shares of Chicago Bears class B common stock were held by HFHC, all of the outstanding shares of Bears class C common stock were held by the Estate of Halas, Jr., and all of the outstanding shares of the Bears class D common stock were held by MFHC.

*Reorganized Chicago Bears Common Stock Ownership*

|  | Number of shares | Percentage of ownership | Class of stock |
|---|---|---|---|
| HFHC | 459 | 49.35% | B |
| MFHC | 183 | 19.68 | D |
| Estate of Halas, Jr. | 183 | 19.68 | C |
| Other Shareholders | 105 | 11.29 | A |
|  | 930 | 100.00 | |

Halas, Sr., died in 1983. Virginia McCaskey and Michael Notaro were duly authorized as executors of his estate.

Pursuant to the Bears' certificate of incorporation, executed on October 19, 1981, the Bears was granted a right to purchase any shares that a shareholder proposed to transfer to parties other than existing shareholders, their spouses, descendants, or the trustee of a trust for the benefit of the same. In 1988, the Bears purchased shares of its class C common stock from the Estate of Halas, Jr. In accordance with the certificate of incorporation, the stock was appraised by three valuation experts chosen in the following manner: one was selected by the Chicago Bears, one was selected by the estate, and the third appraiser was chosen

by the first two appraisers. The third appraiser was Willamette. The Estate of Halas, Jr., and the Chicago Bears jointly employed Willamette.

On June 1, 1988, the treasurer of the Bears, Theodore P. Phillips, and Ellen Cleary of the accounting firm Price, Waterhouse & Co. met with Louis Paone of Willamette to assist Mr. Paone in his efforts to assign a fair market value to the Estate of Halas, Jr.'s class C common stock in the Bears as of the valuation date of May 31, 1988. Prior to this meeting, Mr. Paone had been given background financial information, including the Bears' certified financial statements for the fiscal years ending February 29, 1984 through February 29, 1988. The conversation at the meeting involved a wide-ranging discussion of the Bears' finances in general, the Bears' financial statements, and the general financial operation of National Football League teams.

By separate statutory notices of deficiency, respondent determined deficiencies in estate tax for Halas, Sr., and in gift tax for Virginia McCaskey. Subsequent to argument on petitioner's motion in limine, respondent also issued separate statutory notices of deficiency to the HFHC common stockholders and to the MFHC common stockholders as transferees of the gifts from Halas, Sr. and Virginia McCaskey to HFHC and MFHC respectively.

In response to the notices of deficiency, the three common shareholders of HFHC—MFHC, Stephen Halas, Inc., and Christine Halas, Inc.—filed separate petitions on May 15, 1989. The common shareholders of MFHC, the 11 corporations owned by trusts maintained for the benefit of Virginia McCaskey's children, filed a single petition on June 30, 1989. Virginia McCaskey filed a petition on September 6, 1989.

Respondent seeks to use Willamette as its expert witness to appraise the fair market value of shares of HFHC as of the date of Halas, Sr.'s death. The primary assets of HFHC as of the valuation date were the shares of class B Bears common stock and the interest in the partnership formed to construct and own the skyboxes at Soldiers Field. In *Estate of Halas v. Commissioner,* T.C. Memo. 1989-536, we denied petitioner's motion in limine to bar respondent from "consulting with, reviewing and/or introducing at trial any

expert reports, memoranda or oral testimony prepared by or on behalf of the firm of Willamette Management Associates, Inc., its officers, * * * and/or any related corporations."

Motions in limine to disqualify Willamette as respondent's expert witness were filed by the five new petitioners. Subsequently, all six cases were consolidated for trial. Petitioner filed this motion for reconsideration of our denial of petitioner's motion in limine to disqualify Willamette as respondent's expert witness in *Estate of Halas v. Commissioner*, T.C. Memo. 1989-536. Accordingly, we now consider petitioner's motion to reconsider as well as the five new motions in limine.

The only issue before the Court is whether to disqualify respondent's expert witness. We note that the granting of a motion for reconsideration pursuant to Rule 161 rests within the discretion of the Court. *Vaughn v. Commissioner*, 87 T.C. 164, 166-167 (1986). Motions for reconsideration will not be granted unless unusual circumstances or substantial error is shown. *Vaughn v. Commissioner*, 87 T.C. at 167.

In deciding whether to grant or deny the motion before us we apply the rules of evidence applicable to trials without a jury in the U.S. District Court for the District of Columbia. Thus, the Federal Rules of Evidence govern. In addition, to the extent that they may be appropriate, the rules of evidence contained in the Federal Rules of Civil Procedure will apply. Rule 143(a).

In *Estate of Halas v. Commissioner*, T.C. Memo. 1989-536, we considered petitioner's claim that if respondent were allowed to call Willamette as an expert witness with respect to the value of the gifted stock, Willamette would be valuing virtually the same property that it had previously valued when employed by petitioner. Petitioner argued that this was a conflict of interest or a violation of a privileged and confidential relationship. In our opinion, however, we noted that as respondent's expert, Willamette would be asked to appraise stock of HFHC, not Bears stock, and, furthermore, that Willamette had no prior confidential relationship with petitioner.

Petitioners contend that the filing of the five other petitions involving related gift tax issues results in a

"significant and substantial change in the factual circumstances" considered by the Court in its earlier opinion and that this change in circumstances requires us to reconsider, and by implication, to vacate our opinion. We do not agree with petitioners and we decline to vacate our prior opinion. Petitioners argue that the filing of the five new petitions means that if Willamette is respondent's expert witness, it will appraise virtually the same property it valued previously when employed by the Bears and the Halas, Jr., Estate. Petitioners' argument, however, misses the mark. Although there are similarities in the relative rights and duties of class C common stock, owned by the Estate of Halas, Jr., and class D common stock, owned by MFHC, they are not identical properties. As we stressed in our opinion denying petitioner's initial motion, Willamette had no prior relationship, confidential or otherwise, with the Halas, Sr., Estate. The fact that the five new petitions were filed makes no difference in this regard. The positions of the new petitioners only mirror that of the Halas, Sr., Estate. None of the new petitioners are former or current clients of Willamette. None of the six petitioners may be equated with the Bears or the Estate of Halas, Jr., Willamette's previous clients. The Bears and the Halas, Jr., Estate are the only entities that enjoyed any kind of relationship with Willamette so they are the only ones in a position to properly invoke or waive a privilege against testimonial disclosures by Willamette, if such a privilege existed.

Petitioners argue that a confidential relationship between appraiser and client must be protected, noting that the proper inquiry is what confidential information an expert appraiser has obtained concerning the property to be valued. This argument invokes two distinct legal theories: conflict of interest and privileged communication. In our prior opinion, we considered and rejected petitioner's claim that Willamette had acquired confidential information in the course of its appraisal for the Estate of Halas, Jr., and the Bears, resulting in a conflict of interest if Willamette were to testify for respondent.

We further note that there is no recognized testimonial privilege between appraisers and their clients. Testimonial privileges "contravene the fundamental principle that 'the

public * * * has a right to every man's evidence.' " *Trammel v. United States,* 445 U.S. 40, 50 (1980) (quoting *United States v. Bryan,* 339 U.S. 323, 331 (1950)). Thus, privileges must be strictly construed. *United States v. Nixon,* 418 U.S. 683, 709-710 (1974). Testimonial privilege is not available unless the proposed witness was previously engaged in a confidential relationship with the person or entity who properly seeks the privilege's protection.

Public policies underlying the privilege rules determine which professional relationships ought to be privileged. Federal courts have recognized privileges to protect communications made within the context of various professional relationships such as that of attorney and client, physician and patient, clergyman and penitent. E.g., *Fisher v. United States,* 425 U.S. 391 (1976); *In re Zuniga,* 714 F.2d 632 (6th Cir. 1983), cert. denied 464 U.S. 983 (1983); *In re Verplank,* 329 F. Supp. 433 (C.D. Cal. 1971). The rationale traditionally advanced for these privileges is that public policy requires the encouragement of the communications without which these relationships cannot be effective. The four requisites for privilege are:

(1) The communications must originate in a *confidence* that they will not be disclosed.

(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*

(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation.

[8 J.Wigmore, Evidence, sec. 2285 (McNaughton rev. 1961); emphasis in original; footnote reference omitted.]

None of these well-established policy reasons support petitioners' contention that the relationship between an appraiser and its clients should be regarded as a privileged or confidential one.

Petitioners assert that a professional appraiser is analogous to an attorney. Contrary to petitioners' assertions, we

find that the role of appraisers is in no way analogous to that of attorneys and we conclude that the conflict of interest rules for attorneys do not govern the conduct of appraisers.

In an adversarial system of justice, the function of an attorney is to persuade a judge and jury to uphold his client's position. An attorney's undivided loyalty to his client is a prerequisite to effective and ethical advocacy. In sharp contrast, the ethical rules applicable to appraisers strictly forbid any form of client advocacy. Section 7.5, The Principles of Appraisal Practice and Code of Ethics, promulgated by the American Society of Appraisers (June 30, 1968) (hereinafter Appraisers' Code), condemns advocacy as "unethical and unprofessional" and adverse to "the establishment and maintenance of trust and confidence in the results of professional appraisal practice." Moreover, "advocacy" as proscribed in section 7.5, Appraisers' Code, is defined quite broadly:

> If an appraiser, in the writing of a report or in giving an exposition of it before third parties or in giving testimony in a court action, suppresses or minimizes any facts, data, or opinions which, if fully stated, might militate against the accomplishment of his client's objective or, if he adds any irrelevant data or unwarranted favorable opinions or places an improper emphasis on any relevant facts for the purpose of aiding his client in accomplishing his objective, he is, in the opinion of the Society, an advocate. * * *

We note that appraisers who serve as expert witnesses have occasionally violated the above ethical rules by becoming advocates for their clients.[3] A confidential advocacy relationship between the appraiser and the client would negate an appraiser's effectiveness. In the context of valuation cases, we have observed that experts may lose their usefulness and credibility when they merely become advocates for one side. See, e.g., *Buffalo Tool & Die Manufacturing Co. v. Commissioner*, 74 T.C. 441, 452 (1980).

---

[3]See *Jacobson v. Commissioner*, T.C. Memo. 1989-606 (if experts act as advocates, "the experts can be viewed only as hired guns of the side that retained them, and this not only disparages their professional status but precludes their assistance to the Court in reaching a proper and reasonably accurate conclusion"). See also *Chou v. Commissioner*, T.C. Memo. 1990-90 (expert witnesses' appraisals of fair market value of donated opal ranged from $298,900 to $27,755); *Estate of Hatchett v. Commissioner*, T.C. Memo. 1989-637 (at trial, petitioner's appraiser valued decedent's farmland on alternate valuation date at $176,000; respondent's appraiser valued same farmland at $278,000).

Moreover, this Court has not hesitated to reject expert testimony when we find that the methods opined by the expert constitute advocacy. *Laureys v. Commissioner,* 92 T.C. 101, 127-129 (1989).

An appraiser is barred from presenting facts in a manner calculated to be favorable to his client's position. Not only does the appraiser have "every obligation to avoid giving a false figure," but the "appraiser's primary obligation to his client is to reach complete, accurate, and pertinent conclusions and numerical results regardless of the client's wishes or instructions in this regard." Secs. 3.3, 4, Appraisers' Code. Section 2.2, Appraisers' Code, describes the level of accuracy and objectivity an appraiser must strive for in the appraisal; the numerical result is to be:

objective and unrelated to the desires, wishes, or needs of the client who engages the appraiser to perform the work. The amount of this figure is as independent of what someone desires it to be as a physicist's measurement of the melting point of lead or an accountant's statement of the amount of net profits of a corporation. All the principles of appraisal ethics stem from the central fact. [Sec. 2.2, Appraisers' Code.]

An appraiser has a duty to the Court that exceeds his duty to his client. An appraisal may not:

suppress any facts, data, or opinions which are adverse to the case his client is trying to establish; or to over-emphasize any facts, data, or opinions which are favorable to his client's case * * * . It is the appraiser's obligation to present the data, analysis, and value without bias, regardless of the effect of such unbiased presentation on his client's case. [Sec. 4.3, Appraisers' Code.]

Thus, if Willamette were to be used as an expert by either party in this case, under the Appraisers' Code, its testimony should be essentially the same.

Appraisers' duty to the general public as a third party beneficiary of their work is even greater than their duty to private third parties or their clients. Sec. 3.6, Appraisers' Code. Section 3.7, Appraisers' Code, states that,

Since the general public welfare is often involved in the execution of valuation assignments, the appraiser has an obligation and responsibility to the general public that supersedes the appraiser's obligation to his client.

The appraiser's duty closely corresponds to the public duty of an auditor or certified public accountant. In *United*

*States v. Arthur Young & Co.,* 465 U.S. 805 (1984), the U.S. Supreme Court ruled that a claim of work-product immunity under a purported accountant-client privilege could not be invoked to bar enforcement of an IRS summons for workpapers prepared by an independent certified public accountant firm during an audit of its client-corporations's finances. The Supreme Court found that the public's interest in fostering the accountant-client relationship was outweighed by the government's and public's need for immediate full disclosure of all information relevant to tax liability. The Court, quoting *Couch v. United States,* 409 U.S. 322, 335 (1973), stated that "no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases." *United States v. Arthur Young & Co.,* 465 U.S. at 817. Cf. *United States v. Balistrieri,* 403 F.2d 472, 481 (7th Cir. 1968) ("there is no accountant-client privilege in the federal system.").

We are not persuaded that the integrity of property valuation will suffer in the absence of a testimonial privilege for appraisers' clients. To the contrary, such a privilege might encourage adversarial or result-oriented tendencies. We observe approvingly that, in the event an appraiser is denied access to pertinent data, either by the client or some other party, the appraiser may, at his option, properly decline to carry out the assignment. Sec. 6.6, Appraisers' Code. Section 6.6, Appraisers' Code, also states that an appraiser must cease the assignment if "he considers such data essential to the making of a valid appraisal."

In light of these stringent code requirements, we find that the appraiser's obligation to serve the public interest assures that the integrity of property valuations will be preserved, without the need for a testimonial privilege assertible by an appraiser's clients.

For all of the above reasons, we must deny petitioners' motion to reconsider and vacate our denial of the motion to disqualify Willamette as respondent's expert witness. For the same reasons, the five most recently filed motions in limine to disqualify Willamette are also denied.

*An appropriate order will be issued.*

APPENDIX

## The Principles of Appraisal Practice and Code of Ethics (promulgated by the American Society of Appraisers) Authorized June 30, 1968, reprinted 1988

### 2.2 Objective Character of the Results of an Appraisal Underaking

The primary objective of a monetary appraisal, is the determination of a numerical result, either as a range of most probable point magnitude—the dollar amount of a value, the dollar amount of an estimated cost, the dollar amount of an estimated earning power. This numerical result is objective and unrelated to the desires, wishes, or needs of the client who engages the appraiser to perform the work. The amount of this figure is as independent of what someone desires it to be as a physicist's measurement of the melting point of lead or an accountant's statement of the amount of net profits of a corporation. All the principles of appraisal ethics stem from the central fact.

### 3.3 Appraiser's Obligation to Avoid Giving a False Numerical Result

Obviously, the appraiser has every obligation to avoid giving a false figure. The numerical result of an appraisal could be false for one of two reasons: it could be false because it is a grossly inaccurate estimate of the apposite kind of value or cost estimate, or it could be false, even though numerically accurate, because it is an estimate of an inapposite kind of value or cost estimate.

### 3.6 Appraiser's Fiduciary Relationship to Third Parties

It frequently happens that an appraisal report is given by the client to third parties for their use. These third parties may or may not be known to the appraiser but, regardless of this fact, they have as much right to rely on the validity and objectivity of the appraiser's findings as does the client. Members of the Society recognize their fiduciary responsibility to those parties, other than the client, who make use of their reports.

### 3.7 Appraiser's Fiduciary Relationship To The Public

Since the general public welfare is often involved in the execution of valuation assignments, the appraiser has an obligation and responsibility to the general public that supersedes the appraiser's obligation to his client.

This fiduciary relationship to the public is the same as his fiduciary relationship to third parties (3.6). It applies to assignments involving depositors in a financial institution making loans, to taxpayers in a school district whose board is acquiring a new schoolsite, to taxpayers represented by government agencies who are acquiring property under eminent domain proceedings, and to publicly displayed values of real or personal property that are offered for sale to the public.

### 4 Appraiser's Obligations to the Client

The appraiser's primary obligation to his client is to reach complete, accurate, and pertinent conclusions and numerical results regardless of the client's wishes or instructions in this regard. The relationship between client and appraiser is not one of principal and agent. However, the appraiser's obligations to his client go somewhat beyond this primary obligation. These secondary obligations are set forth in the following sections.

### 4.3 Appraiser's Obligation Relative to Giving Testimony

When an appraiser is engaged by one of the parties in a controversy, it is unethical for the appraiser to suppress any facts, data, or opinions which are adverse to the case his client is trying to establish; or to over-emphasize any facts, data, or opinions which are favorable to his client's case; or in any other particulars to become an advocate. It is the appraiser's obligation to present the data, analysis, and value without bias, regardless of the effect of such unbiased presentation on his client's case. (Also, see Sec. 7.5)

If an appraiser, in the writing of a report or in giving an exposition of it before third parties or in giving testimony in a court action, suppresses or minimizes any facts, data, or opinions which, if fully stated, might militate against the

accomplishment of his client's objective or, if he adds any irrelevant data or unwarranted favorable opinions or places an improper emphasis on any relevant facts for the purpose of aiding his client in accomplishing his objective, he is, in the opinion of the Society, an advocate. Advocacy, as here described, affects adversely the establishment and maintenance of trust and confidence in the results of professional appraisal practice and the Society declares that it is unethical and unprofessional. (Also, see Sec. 4.3).