## In re AMBASSADOR GROUP, INC., LITIGATION.

### MDL No. 778 (RJD).

United States District Court,
E.D. New York.

Dec. 19, 1994.

Jones, Day, Reavis & Pogue by Fordham E. Huffman, Richard B. Whitney, Cleveland, OH, for plaintiff.

Arnold & Porter by Jay Kelly Wright, Roger P. Fendrich, Michael S. Solander, New York City, and Washington, DC, for defendant.

## Memorandum and Order

CADEN, United States Magistrate Judge.

Plaintiff Elizabeth Costle, Vermont Commissioner of Banking, Insurance and Securities, Receiver of Ambassador Insurance Company, brings this motion to disqualify the accounting firm of Johnson, Lambert & Capron from providing accounting consulting services to defendant Coopers & Lybrand, L.L.P.

An evidentiary hearing on this motion was conducted by the undersigned on October 28 and 31, 1994. Based upon the following findings of facts and for the reasons set forth below, plaintiff's motion to disqualify Johnson, Lambert & Capron is denied.

## BACKGROUND

This multi-district litigation consists of a series of suits arising out of the insolvency and liquidation of Ambassador Insurance Company ("Ambassador") and its subsidiary, Horizon Insurance Company. Ambassador is currently in court-supervised insolvency proceedings.

In November 1983, pursuant to a court order, the Vermont Commissioner of Banking, Insurance and Securities (the "Receiver") gained control over Ambassador's books, records and assets ($120 million). In the process of liquidating Ambassador, the Receiver is responsible for evaluating and paying claims against Ambassador as well as pursuing recovery of amounts due to Ambassador from various entities including reinsurers. Since 1983, the Receiver has paid out approximately $100 million in claims.

The Receiver is the plaintiff in one of the multi-district cases, *Costle v. Chait* (D.N.J. No. 85–8441), filed in May of 1985, in which Ambassador's former managers and former auditor, Coopers & Lybrand, are named as defendants. Coopers & Lybrand provided audit services to Ambassador prior to the Ambassador receivership (the final audit was performed on December 31, 1982). In *Costle v. Chait*, the Receiver alleges mismanagement, fraud and breach of fiduciary duty on the part of Ambassador's former managers. The Receiver further alleges that Coopers & Lybrand negligently failed to inform regulatory authorities of Ambassador's "true" condition. The Receiver seeks recovery for the insolvency or shortfall—the amount due to claimants after Ambassador's assets have been exhausted. The estimated amount of the shortfall has varied from a projected $20–$45 million in 1984 to a projected $100 million more recently. *See* Def.'s Memorandum in Opposition to Motion to Disqualify at 4–5 (Oct. 5, 1994).

The size of the shortfall has led Coopers & Lybrand to inquire of the actions of the Receiver and its staff, taken during the 10 years of the Receiver's stewardship of Ambassador. Coopers & Lybrand argues that because the Receiver claims Coopers & Lybrand is potentially liable for the *entire* shortfall amount, the methods used in calculating

the shortfall are critical. Projecting the shortfall involves predicting, evaluating and estimating inchoate claims which in turn requires familiarity with complicated accounting and actuarial principles. Consequently, Arnold & Porter, counsel for Coopers & Lybrand, has sought to retain Richard Larry Johnson to provide it with technical accounting assistance. Johnson is a Certified Public Accountant with expertise in this area and is the managing partner of the firm Johnson, Lambert & Capron.

Johnson, Lambert & Capron ("JLC") has offices in Washington, D.C.; Bethesda, Maryland; San Jose, California; Burlington, Vermont; and New York. Hearing Transcript ("Tr.") at 229–30. The firm has four partners, approximately 35 professionals and is one of the principal accounting firms doing work in Vermont. Tr. 111, 229.

At the heart of this disqualification motion are two professional contacts between JLC and the Receiver which, for convenience, will be characterized as engagements. In 1993, Deborah D. Lambert, the partner in charge of JLC's Vermont insurance practice, was retained by the Vermont Commissioner to perform audit work for Beverage Retailers Insurance Company Risk Retention Group— In Rehabilitation ("BRICO"). BRICO's statutory receiver is also the Vermont Commissioner of Banking, Insurance and Securities (referred to herein as the "Receiver" regardless if referenced in her capacity on behalf of BRICO or Ambassador). Secondly, in 1994, Lambert was contacted by Robert Savage (manager of the Ambassador receivership) to perform specific accounting services for the Ambassador receivership. Because of their significance to this motion, the two engagements are discussed with greater specificity below.

### A.  The JLC–Ambassador/RCA Engagement

Ambassador is a Vermont-domiciled casualty insurer and was placed into receivership by the Vermont Superior Court (Washington County) in 1983. The Ambassador receivership is organized with the Vermont Commissioner at the top of the hierarchy as the Receiver, George Bernstein as the court-appointed agent of the Receiver, Robert Savage as the full-time manager, and 17 employees.

Ambassador, a primary insurer, farms its insurance out to reinsurers. Consequently, a large portion of its assets is comprised of monies due to it from reinsurers. Accordingly, some of the Receiver's activities, *inter alia*, involve negotiation and settlement of disputes with reinsurers. On or about February 7, 1994, JLC (Lambert) was contacted by Savage to perform audit work with respect to one of Ambassador's reinsurers, Reinsurance Corporation of America ("RCA"). Tr. 181–82. RCA had informed the Receiver that it was unable to meet its obligations (*i.e.*, to pay claims on behalf of Ambassador). RCA is a named defendant in proceedings instituted by the Receiver in Vermont state court. Because RCA's purported inability to meet its obligations was belied by its annual statements and balance sheets, the Receiver requested Lambert and her staff to investigate RCA's financial condition. Tr. 26.

To prepare Lambert for the RCA–Ambassador work, the Receiver provided her with RCA's annual financial statement (public information). Lambert and David Tatlock (a JLC associate in the Vermont office) placed a telephone call together to a RCA representative, during which JLC was denied access to RCA's books. Apart from this, no other work was done. Subsequently, the Receiver was informed that JLC could not do any more Ambassador-related work on her behalf.

### B.  The JLC–BRICO Engagement

BRICO, a Vermont-domiciled insurer, went into receivership on August 12, 1993. BRICO is in court-ordered rehabilitation pending the Receiver's recommendation on whether BRICO should continue its operations or undergo liquidation.[1] Tr. 10.

BRICO is structured similarly to Ambassador with the same individuals managing

---

1. According to Bernstein, the receiver has already made this decision, which is not a matter of public record, and David Tatlock, employed by JLC at their Vermont office, is privy to this information. Tr. 10–11, 58.

the receivership as in Ambassador. In BRICO, the Vermont Commissioner of Banking and Insurance is the Receiver; Bernstein is the Special Deputy Commissioner (akin to his role in Ambassador as Agent); and Savage performs day-to-day management functions. Tr. 6–7. There are an additional five employees servicing both BRICO and Ambassador: (1) Steve Hinchey, accounting director; (2) Paul Rico, claims director; (3) Richard Robinson, claims examiner; (4) Howard Calder, general counsel; and (5) Joanne La Rochelle. Tr. 76. Both the BRICO and Ambassador receiverships are headquartered at the same location.

BRICO is a captive insurer—all of its management functions are performed by Victor O. Shinnerer & Co., Inc. ("VOSCO"), a professional management company. VOSCO underwrites claims and receives premiums on behalf of BRICO as well as other insurance companies, pools these premiums and distributes them aliquot. Tr. 9.

JLC was initially retained, on or about October 21, 1993, by the Receiver to investigate the accuracy of VOSCO's allocation and management of BRICO's funds and accounts. On October 22, 1993, BRICO staff met with Lambert at JLC's Bethesda offices to discuss the VOSCO-related work. The ultimate objective was to gather information to help the Receiver determine whether or not to bring claims against VOSCO, in its capacity as management, for BRICO's condition. Tr. 15. Lambert, Savage and Hinchey spent approximately one week in VOSCO's offices inspecting its books and records and subsequently, Lambert prepared a draft report formalizing her findings. Tr. 19–20.

In March 1994, Savage and Bernstein contacted JLC about ascertaining how BRICO's predecessor auditor (coincidentally also Coopers & Lybrand) came up with its reserve numbers for the 1992 year-end (an audit that was never completed). Tr. 23. This work was put on hold due to expense considerations. Tr. 23.

The JLC–BRICO work consisted of: (1) the VOSCO inspection and a report of findings; (2) an audit for the 1993 year-end; (3) closing BRICO's accounts for 1993; and (4) preparing statutory financial statements.

The Receiver also considered Tatlock a "resource person" for the receivership.

## C. The JLC–Coopers & Lybrand Engagement

In February or March of 1994, Johnson was contacted by Jay Kelly Wright of Arnold & Porter, the attorney of record for Coopers & Lybrand, with regard to a proposed retention in the Ambassador litigation. Tr. 230. Because Lambert was the partner in charge of the Vermont practice, Johnson spoke with her about possible conflicts with the Ambassador work for Coopers & Lybrand. Tr. 232. Johnson testified that he focused on whether or not JLC had obtained any information relevant to Ambassador by virtue of its association with the Receiver. Tr. 235. Johnson ultimately reached the conclusion that while he thought—taking into consideration the applicable accounting standards—that JLC could have continued to do work for the Receiver on Ambassador (with appropriate confidentiality safeguards in place), together with the Coopers & Lybrand engagement, it was more prudent to decline the Ambassador work. Tr. 238. Specifically, Johnson explained that a conflict between the two assignments did not exist unless he had acquired confidential information about Ambassador by virtue of JLC's association with BRICO. Tr. 240. Further, he saw no client loyalty dilemma with respect to the BRICO work because he viewed BRICO as separate from Ambassador regardless of their overlapping staffs. Tr. 241. Johnson testified that precautions have already been taken to shield JLC employees working on the two different assignments, JLC–BRICO and JLC–Cooper's & Lybrand, from confidential information. Tr. 245–246.

Bernstein did not learn of the JLC–Coopers & Lybrand relationship until after April 28, 1994. Tr. 25. He testified that on April 28, 1994, at a BRICO-related meeting held at the Insurance Department in Vermont, the head of the "Captives Bureau" informed him of the JLC–Coopers & Lybrand relationship. Tr. 27. Bernstein questioned Tatlock, also present at this meeting, about the supposed retention. Tr. 28. When Johnson appeared at Bernstein's deposition in July 1994 (on the

third or fourth day into his deposition), Bernstein refused to continue the deposition until Johnson left. Tr. 32–34.

At the hearing, Bernstein testified that he was under the impression that JLC was still providing services to BRICO. Tr. 12. According to Bernstein's testimony, JLC had been contacted regarding updating BRICO's balance sheet as of September 30, 1994. Tr. 20. Lambert testified that the most recent assignment from BRICO was put on hold pending resolution of the instant disqualification motion. By letter dated November 2, 1994, the undersigned was informed by counsel for the Receiver that BRICO has terminated its relationship with JLC.

## DISCUSSION

In short, the Receiver perceives JLC's retention by Cooper & Lybrand as an "adverse engagement" which constitutes a conflict of interest and that, consequently, JLC is precluded from acting as a litigation consultant for Coopers & Lybrand. Additionally, the Receiver points to the seeming impropriety of the JLC–Coopers & Lybrand relationship given the prior involvement between JLC and the Receiver (on BRICO). Alternatively, Coopers & Lybrand views its retention of JLC as devoid of conflict—it claims that JLC was not privy to any confidential information about Ambassador. More specifically, Coopers & Lybrand asserts that because *Johnson* possesses no disqualifying information, Coopers & Lybrand will not be unfairly advantaged by JLC's predating relationship with the Receiver.

The different positions taken by the Receiver and Coopers & Lybrand reflect their different characterizations of the relationship between JLC and the Receiver. Specifically, the parties diverge on whether or not: (1) JLC was privy to confidential information on

Ambassador based on the JLC–BRICO involvement; (2) JLC accepted the JLC–Ambassador engagement and the significance of that; and (3) JLC was part of the "BRICO team". The parties' papers reveal yet another discrepancy: the parties disagree whether Johnson was retained by Coopers & Lybrand to support Cooper's & Lybrand's attempt, as part of its defense, to transfer blame to the Receiver and/or the Receiver's staff, for mismanagement of the Ambassador receivership.[2] Further, conflicting testimony was presented by Savage and Lambert on: (1) what was disclosed to Lambert on Ambassador; (2) the reception that Lambert could anticipate from RCA; and (3) the continuing nature of the JLC–BRICO involvement.

### A. Applicable Legal Standards

■ It is inherently within a court's power to disqualify an expert. *See Cordy v. Sherwin–Williams Co.,* 156 F.R.D. 575, 579 (D.N.J.1994); *English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F.Supp. 1498, 1501 (D.Colo.1993); *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,* 734 F.Supp. 334, 336 (N.D.Ill.1990). This power derives from the court's "judicial duty to protect the integrity of the legal process." *Wang Labs, Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991).

The Receiver sees JLC's association with Coopers & Lybrand as a clear example of "side-switching." Citing *Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588 (D.Minn.1986) (Symchych, M.J.), the Receiver equates expert disqualification standards with those applicable to attorneys.

■ Motions to disqualify arise with great frequency in the area of attorney conflicts; consequently, the applicable guidelines for attorney disqualification are well-established.[3] Comparably, there is relatively little

2. *See, e.g.,* Pl.'s Memorandum in Support of Motion to Disqualify at 5–6 (Aug. 22, 1994), wherein the Receiver alleges that Coopers & Lybrand is attempting to show that the Receiver and staff "were too aggressive, too arbitrary, too abusive, or too incompetent to see" that Ambassador was not insolvent and need not have been liquidated. Coopers & Lybrand, however, asserts that while "a trier of fact may one day draw those conclu-

sions," Johnson was retained to provide technical accounting assistance.

3. Recently, Judge Conner succinctly laid out the Second Circuit's test for attorney disqualification:

[A]n attorney may be disqualified from representing a client in a particular case if: (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial rela-

authority on expert disqualification. Accordingly, the first issue properly addressed is whether or not attorney conflict analysis provides appropriate guidance in a motion to disqualify an expert.

In a thorough comparison of the roles of an attorney and expert and upon review of the applicable Canons of the American Bar Association Code of Professional Responsibility[4], Judge Broderick declined to summarily apply attorney conflict standards to experts. *E.E.O.C. v. Locals 14 and 15, Int'l Union of Operating Engineers*, 72 CV 2498, 1981 WL 163 at *4 (S.D.N.Y.1981) (experts "do not serve as advocates, but as sources of information.... and, if they testify, to help the trier of fact to understand the relevant evidence").

Other courts have ruled similarly. *See, e.g., English Feedlot v. Norden*, 833 F.Supp. at 1501 ("[t]he expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than attorneys"); *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 281 (S.D.Ohio 1988) (attorneys occupy "a position of higher trust, with concomitant fiduciary duties, to a client than does an expert consultant"). Further, while the issue has not been raised here, some courts have stressed that "if experts are too easily subjected to disqualification, unscrupulous attorneys and clients may attempt to create an inexpensive relationship with potentially harmful experts solely to keep them from the opposing party." *English Feedlot v. Norden*, 833 F.Supp. at 1505 (*citing Paul v. Rawlings*, 123 F.R.D. at 281–82). Accordingly, this court will not be guided by stringent attorney-client conflict standards in determining whether JLC should be disqualified.

Some federal courts have applied a two-pronged test when faced with a motion to disqualify an expert on the basis of the expert's prior relationship with a party: "First, was it objectively reasonable for the first party who retained the expert to believe that a confidential relationship existed? Second, did that party disclose any confidential information to the expert?" *English Feedlot v. Norden*, 833 F.Supp. at 1502 (*citing Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C.1991)). *See also Palmer v. Ozbek*, 144 F.R.D. 66, ʹ67 (D.Md.1992); *Wang v. Toshiba*, 762 F.Supp. at 1248.

While there are no cases in this circuit setting forth the test specifically as such, the expert disqualification cases undertake a similar analysis. *See, e.g., Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 83 Civ. 8898, 1989 WL 31514 (S.D.N.Y. March 28, 1989) (affirming magistrate judge's findings that in prior relationship with party, long-term relationship with expert was not commenced and that during the initial consultation, privileged communications were not divulged); *Nikkal Industries, Ltd. v. Salton, Inc.*, 689 F.Supp. 187 (S.D.N.Y.1988) (affirming magistrate judge's findings that in prior relationship with party, expert was not retained and no privileged communications were divulged); *E.E.O.C. v. Locals 14 and 15, Int'l Union*, 1981 WL 163 at *5 (declining to "extend the same prophylactic rule governing attorneys to experts").

### 1. Existence of a Confidential Relationship

It appears that JLC accepted an engagement with the Receiver on the Ambassador–RCA related work. Tr. 152. However, the parties diverge on whether or not JLC actually commenced the engagement. The

---

tionship between the subject matter of the counsel's prior representation of the moving party and the issue in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. *In re Del–Val Financial Corp. Securities Litigation*, 158 F.R.D. 270, 273 (S.D.N.Y.1994) (*citing Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983)).

In short, the Second Circuit's rationale for the above analysis is simply that "an attorney may not knowingly reveal a confidence of his client or use a confidence to the disadvantage of his client." *In Re Del–Val*, 158 F.R.D. at 273 (*citing Evans v. Artek*, 715 F.2d at 791).

4. Specifically, the applicable Canons reviewed, as applied by the Second Circuit, were Canons 4, 5 and 9.

inconsistent testimony is largely irrelevant.[5] Whether it would make a difference if JLC was officially retained or not by the Receiver on Ambassador, the court agrees with Coopers & Lybrand's accounting expert[6]—this is a "distinction without a difference." Tr. 320–21. The inquiry is not a "bright line test", *i.e.,* the emphasis is not on whether JLC was retained, *per se. Paul v. Rawlings,* 123 F.R.D. at 278. Rather, the appropriate inquiry is: did JLC and the Receiver have a "relationship which permitted [the Receiver] reasonably to expect that any communications concerning [Ambassador] would be maintained in confidence by [JLC]." *Id.* at 278; *see also Great Lakes v. Harnischfeger,* 734 F.Supp. at 336.

Because of the involvement between JLC and the Receiver on BRICO, and for purposes of this analysis, the court finds that a relationship was established between JLC and the Receiver such that it was objectively reasonable for the Receiver to assume a confidential relationship.

■ The existence of a confidential relationship, however, does not end the inquiry. In order to warrant disqualification, disqualifying information about Ambassador must also have been transmitted to JLC. *See Paul v. Rawlings,* 123 F.R.D. at 279.[7]

## 2. Disclosure of Confidential Information
### a. Ambassador

Savage testified that he thought he discussed material about Ambassador, characterized by him as confidential, during the course of a conversation with Lambert.[8] Savage, however, did not specifically recollect what he told Lambert. Tr. 107. Savage's statements were vague and ambiguous and fail to support an argument that the Receiver would thereby be prejudiced. *See Palmer v. Ozbek,* 144 F.R.D. at 67 (prejudice is a relevant inquiry). Accordingly, the court credits Lambert's testimony that she was not privy to any confidential information about Ambassador.

### b. BRICO and the Receiver's Modus Operandi

■ There is no doubt that JLC was privy to confidential information regarding the BRICO receivership and the parties do not dispute this. Rather, central to the Receiver's argument is that JLC was privy to the Receiver's *modus operandi* by virtue of its work on BRICO—and that this constitutes "confidential information" attributable to the Ambassador receivership. The court does not find this theory tenable, nor is it supported by the record.

Savage testified that the BRICO and Ambassador receiverships have operations and

---

**5.** Savage testified that he called RCA and was told that an auditor could come and look at RCA's books and records in order to determine whether RCA was accurately depicting its financial condition. Tr. 91. According to Savage, Lambert was amenable to doing this work and told him that she would get back to him on a firm price. Tr. 92. Lambert recalls that Savage indicated to her that he was not sure what kind of reception she would receive from RCA and her impression was that RCA was not expecting her call. Tr. 182–183. Further, when Lambert called RCA to arrange a visit to inspect records and interview people, she was told that RCA would have to consult with counsel first. Tr. 153.

**6.** A. Marvin Straight, a Certified Public Accountant and member of various professional associations, who, in the past, has held high ranking positions with the American Institute of Certified Public Accounts (the "AICPA") (including chairing the committee that drafted the AICPA's code of ethics), was admitted to testify as an expert.

**7.** The same holds true, on a waiver theory, for the obverse situation. An expert will not be disqualified if a confidential relationship was not formed regardless of whether confidential information was transmitted to the expert. *See Estate of Halas v. Commissioner,* 94 T.C. 570, 577, 1990 WL 40948 (1990).

**8.** Savage characterized his conversation with Lambert on February 6, 1994 regarding the RCA work, as disclosing the Receiver's settlement policy. Tr. 93. Savage thought he revealed confidential information to Lambert on Ambassador:

> I think we talked about negotiating technics [sic]; I think we talked about our positions vis-a-vis a number of reinsurers. I think we talked about the possibility of what we would have to do. I believe I revealed my thought process. I think that was confidential material. Tr. 96.

Both Lambert and Tatlock testified that they were not privy to any confidential information about Ambassador. Tr. 186, 214.

management functions which are identical: "[s]ame cash handling, same bank, same examiner, same claims philosophy, same payment philosophy, same evaluation philosophy, same reserve philosophy." Tr. 90. Similarly, when asked at the hearing what troubled him about Coopers & Lybrand's retention of JLC, Bernstein characterized his concerns in the following way:

[JLC] are going to make more money doing this litigation, so they drop us because we are a peanut client. That outrages us and it is not just a personal outrage.... The objective concern is that this case, this litigation that we are here on today involves the type of issues that we discussed with Johnson, Lambert during the course of the BRICO proceedings, propriety of management activities; propriety of our activity, how we think, what we are looking for; how we negotiated reinsurance settlements; how we determine who did what, when and whether there is legal responsibility for it. Those sort of things we would[n't] [sic] talk about with someone who didn't think were members of our team.

\* \* \* \* \* \*

And these conversations, and these insights into our thinking are things that we wouldn't have given them if we had known that they would be on the other side of us, and particularly on the other side of us when the other side is raising issues about our management of the Ambassador receivership, and 99 percent of the nine days of depositions by Mr. Wright of me involved how we managed the receivership the receivership of Ambassador ... Tr. 37–38.

The Receiver finds support for its position, summarized by Bernstein, in *Marvin Lumber v. Norton*, 113 F.R.D. 588 (D.Minn.1986). In *Marvin Lumber*, the plaintiff sought to disqualify defendant's consulting expert, a scientific testing laboratory, expected to testify at trial, on conflict grounds. The laboratory had an ongoing relationship with plaintiff wherein it provided a range of services (testing, product development, etc.) to plaintiff and also served as plaintiff's litigation expert in a case involving similar issues. Accordingly, the court found that:

[T]he record support[ed] a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of plaintiff's modus operandi, patterns of operation, decision-making process and the like. The rules governing disqualification are designed to protect against the potential breach of such confidences, even without any predicate showing of actual breach. That is the case with respect to expert witnesses ... just as it is the well-accepted rule with respect to attorney disqualification. The threat or potential threat that confidences may be disclosed is enough. *Id.* at 591 (citations omitted).

Because, as discussed above, the court declines to adopt the same disqualification standards for experts as for attorneys, *Marvin Lumber* is not persuasive authority (*i.e.*, a predicate showing that confidential information has been divulged *is* required).[9] Moreover, even if the same standards do govern, the court is not convinced that the Receiver has put forth a *modus operandi* argument that would compel disqualification under the *Marvin Lumber* reasoning. In *Marvin Lumber*, the court made a finding that the subject matter of the prior relationship impinged specifically on the *Marvin Lumber* litigation. *See also Stanford v. Kuwait Airways Corp.*, Nos. 85 Civ. 0477, 2448, 1989 WL 297860 at \*1 (S.D.N.Y. July 10, 1989) (requiring a showing of a "substantial relationship between the prior association and the current proposed relationship" to justify disqualification). Here, the Receiver has not

---

9. Although there is one case in this circuit which might be construed as holding that attorney disqualification principles apply, that case, *Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 83 Civ. 8898, 1989 WL 31514 (S.D.N.Y. March 28, 1989), is factually distinguishable. In *Michelson*, the court was persuaded by the *Marvin Lumber* reasoning because *one party* (the expert) was privy to all of the information and therefore, although no confidential information had been divulged, it was impossible to protect against a potential future breach. *Id.* at \*4. Here JLC has represented that its employees who worked on BRICO will not be working on Ambassador.

convincingly detailed how knowledge of the Receiver's methods and procedures, garnished from work performed on behalf of BRICO, bears a substantial relationship to Ambassador such that disqualification would be warranted.

The Receiver also fails to particularize how knowledge of the Receiver's *modus operandi* would be prejudicial to it in the Ambassador litigation. Coopers & Lybrand's purported attempt to transfer liability to the Receiver for the shortfall does not render the Receiver's methodology confidential. The Receiver's potential accountability for the Ambassador Receivership is simply not germane.

The record amply supports the conclusion that the Receiver's *modus operandi* is not confidential information on Ambassador. The BRICO and Ambassador receiverships are separate from each other except both receiverships are located on the same premises and are staffed by some of the same individuals. Tr. 89. The receiverships have separate letterheads, bank accounts, books and records. Tr. 50. At the hearing, Coopers & Lybrand's accounting expert testified that facts and circumstances are different in every receivership/liquidation; there are inevitably different contracts, different relationships and different creditors. Tr. 313. Similarly, common sense undermines the Receiver's *modus operandi* argument; as testified by Coopers & Lybrand's expert, the systems and procedures of the Receiver have "probably been already discovered in the ten years of Ambassador litigation." Tr. 314. The court, however, does not need to make such a finding.

Further, there is no evidence that even if, *arguendo,* information about BRICO was relevant to Ambassador, that any such information was relayed by Lambert to Johnson either before or during their conversation about possible conflicts between the two engagements.[10] At the hearing, Johnson testified that measures had been implemented such that a "Chinese Wall" is currently in place. Such precautions have been held sufficient to dispel fears of possible future disclosures of confidential information. *See, e.g., E.E.O.C. v. Locals 14 and 15, Int'l Union,* 1981 WL 163 at *6 (holding that danger of disclosure of confidential information could be eviscerated by means of a screening order).

The Receiver's position—that JLC was on the "BRICO team"—does not further its disqualification motion. Thereby, the Receiver intimates that JLC played an advocacy-like role. First as already determined above, confidential information about BRICO is not imputed to Ambassador. Second, the record does not sufficiently demonstrate that JLC was in fact a "BRICO team" member. Specifically, the expert explained that "independent auditors" cannot properly be team players: "Clearly, to be independent, [auditors] are not part of management, they don't make decisions ... team players take a little liberty."[11] Tr. 316. Accordingly, there is no need for the court to sort out the inconsistent testimony provided by Lambert and Savage on this issue.[12]

## B. Applicable Accounting Standards

The conclusion—that disqualification is not warranted—reached by applying the legal standards to the instant facts, is supported

---

**10.** The Receiver speculates that neither Lambert nor Johnson were adequately "sensitized" to issues in the Ambassador litigation to be able to evaluate what constitutes disqualifying information. *See* Pl.'s Post–Hearing Submission at 11 (Nov. 30, 1994). This argument is without merit; both Johnson and Lambert are respected professionals in their field and fully capable of making such assessments.

**11.** *See* Rule 101 of the AICPA Code of Professional Responsibility ("[a] member in public practice shall be independent in the performance of professional services as requiring standards promulgated by bodies designated by Council").

**12.** Savage testified that he considered Lambert the "senior accountant on the [BRICO] team ... we had various functions to accomplish individually, but we would get together constantly as a team and discuss our results." Tr. 83. Alternatively, Lambert's impressions were that the BRICO work was finite and that her involvement did not include a continuing role as consulting accountant. Tr. 120, 127, 173. Further, Lambert did not understand, as Bernstein testified that he told her, that she might be expected to testify at trial (in Vermont) for the Receiver. Tr. 119, 172, 180.

by the applicable accounting standards as set by the American Institute of Certified Public Accountants (the "AICPA"). The AICPA is a nation-wide professional organization for Certified Public Accountants ("CPAs"). It has approximately 300,000 members and is considered the standard setter in the accounting profession. Tr. 303. One of the AICPA's publications, *Conflicts of Interest in Litigation Services Engagements* (1993), was offered by both parties and was admitted into evidence at the hearing. In this publication the AICPA sets out the following conflicts guidelines:

*The Need to Maintain Integrity and Objectivity*

.02 In a litigation services engagement, a conflict of interest exists when a CPA's ability to objectively evaluate and present an issue for a client will be impaired by current, prior, or possible future relationships with parties to the litigation. As a professional, the CPA should avoid engagements that involve conflicts of interest. Rule 102 of the AICPA Code of Professional Conduct requires that members shall, in the performance of any professional service, maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate their judgment to others. *Id.* at 72/100–1.

The Coopers & Lybrand's expert testified that the key issue in finding a disqualifying conflict is "whether Mr. Johnson has access to or obtained information, confidential information related to this specific litigation engagement." Tr. 311. Johnson testified that he viewed the Ambassador and BRICO receiverships as two different clients because no one at JLC had "become aware of any information of a confidential matter related to the Ambassador receivership and in litigation concerning Coopers & Lybrand." [13] Tr. 289. The court agrees. Accordingly, disqualification is not warranted under the existing legal authority nor under the AICPA standards.

## CONCLUSION

For all the foregoing reasons, the Receiver's motion to disqualify JLC from serving as litigation consultant to Coopers & Lybrand is denied.

---

**13.** Johnson testified that he viewed the JLC–Ambassador involvement, if it had come to fruition, as falling squarely in the parameters of one of the AICPA examples (.05 & .06) found in its publication, *Conflicts of Interest* at 72/100. Tr. 283. The scenario is the following:

Alan Mason, a tax CPA, provides Company A with only tax advise and tax compliance reporting. Company B approaches George Carpenter, partner in the litigation services division of Mason's firm, for assistance in developing its damages case against Company A. The damages case involves matters totally separate from the tax engagement. Should Carpenter decline this engagement because of potential conflict of interest?

If Carpenter has had no access to confidential information about the matter in litigation and would establish procedures to ensure there will be no such access during the pendency of the case, he could conclude that no conflict exists. However, the existence of the tax engagement should be disclosed to the attorney for Company B and, if possible, Company A also should be informed. Early disclosure gives Company B's attorney an opportunity to consider this issue before retaining Carpenter and gives Company A an opportunity to object if it views the appearance of conflict differently from Carpenter.

According to Johnson, in the above hypothetical, Company A is Ambassador and George Carpenter is Johnson. Tr. 283, 285. Consequently, if JLC was not precluded from doing work for both Ambassador and Coopers & Lybrand, if it had been retained by the Receiver to do the RCA work, it would follow that BRICO, one further step removed, also did not present conflict problems. Tr. 284. Johnson further testified that because the Ambassador involvement was never realized, *i.e.* he believed that JLC never accepted the Ambassador assignment, Ambassador did not have to be notified of the JLC–Coopers & Lybrand relationship. Tr. 286–88.