T.C. Memo. 2001-160

UNITED STATES TAX COURT

WAGNER CONSTRUCTION, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3819-99.                       Filed June 29, 2001.

<u>John K. Steffen</u>, <u>Walter A. Pickhardt</u>, and <u>Myron L. Frans</u>,
for petitioner.

<u>Jack Forsberg</u> and <u>Eric W. Johnson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax of $370,158 for the taxable year
ending October 31, 1995, and $317,261 for the taxable year ending
October 31, 1996.

The issue for decision is whether petitioner may deduct as officer compensation paid to Dennis Wagner (Dennis) and Curtis Wagner (Curtis) for taxable years ending October 31, 1995 and 1996, the amounts shown below as the parties contend, or some other amounts:

|       | Petitioner | | |
| Year | Dennis | Curtis | Total |
| 10/31/95 | $1,048,200 | $246,688 | $1,294,888 |
| 10/31/96 | 699,192 | 400,573 | 1,099,765 |

|       | Respondent | | |
| Year | Dennis | Curtis | Total |
| 10/31/95 | $243,000 | $192,450 | $435,450 |
| 10/31/96 | 258,600 | 202,350 | 460,950 |

Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

A. General Background

Petitioner is a Minnesota corporation that was incorporated on November 1, 1985. When the petition in this case was filed, petitioner maintained its principal place of business in International Falls, Minnesota.

During the years in issue, Dennis and Curtis were petitioner's sole stockholders. Dennis and Curtis are the sons of Clifford Wagner (Clifford) and Evelyn Wagner (Evelyn). Dennis was born in 1952, and graduated from high school in 1971. Curtis was born in 1954, and graduated from high school in 1973. Neither Dennis nor Curtis attended college. Both began working with their father when they were young boys.

Petitioner is the successor to a partnership called Clifford Wagner & Dennis Wagner Construction (Wagner & Wagner). Clifford and Dennis formed Wagner & Wagner in 1974 to conduct a logging business. In 1976, Wagner & Wagner acquired a construction business that previously had been owned by Clifford and a third individual. Clifford and Dennis each owned a 50-percent interest in Wagner & Wagner.

On November 1, 1985, Clifford and Dennis incorporated petitioner. At that time, the construction business of Wagner & Wagner was well established; the partnership had approximately 30 employees[1] and normally operated four construction crews during the construction season.

Wagner & Wagner transferred assets of $638,916 and liabilities of $127,543 to petitioner. The transfer was treated as a contribution to capital on petitioner's books. The amount

---

[1]Wagner & Wagner had seven or eight full-time employees; the other employees were seasonal.

of additional paid-in capital reflected on petitioner's balance sheet dated November 1, 1985, was $332,373. The $332,373 net equity on the books included a charge of $179,000 for deferred income taxes attributable to Wagner & Wagner's being an accrual basis taxpayer and petitioner's being a cash basis taxpayer. Additionally, the financial statements show a capital contribution of $2,000 for the common stock.

Initially, Clifford and Dennis each owned 1,000 shares (50 percent) of petitioner's stock. Clifford died on April 15, 1986. In August 1986, petitioner redeemed 1,000 shares of its stock for $157,883 payable to Evelyn in monthly installments of $2,000 with interest at a rate of 9 percent per annum. At the same time, Dennis transferred 250 of his 1,000 shares of petitioner's stock (25 percent of the outstanding stock) to Curtis, and Evelyn gave each son a 25-percent interest in Wagner & Wagner. From August 1986 through the years at issue, Dennis owned 75 percent of petitioner and Wagner & Wagner, and Curtis owned 25 percent.

On January 1, 1988, Wagner & Wagner transferred a substantial portion of its net assets (assets of $703,257 and liabilities of $207,106) to petitioner, and petitioner issued to Wagner & Wagner a debenture of $496,151 due January 1, 1993. The debenture bore interest at an annual rate of 8 percent and was recorded as long-term debt on petitioner's books.

B.  Petitioner's Business Activity

From 1985 through the years at issue, petitioner's primary business activity was sewer, water, and road construction (highway and heavy construction).  Because of the seasonal nature of the construction work performed by the company, petitioner also performed contract logging in the winter months.  The logging operation complimented petitioner's construction business because petitioner could use its trucks and equipment during the winter months.  This seasonal operation kept many of petitioner's construction employees working throughout the winter months.  Petitioner also owned and operated property for storage of logs and construction materials and owned and operated sand and gravel pits.

Petitioner was required to submit competitive bids for highway and heavy construction contracts.  Petitioner submitted detailed information in the bids that included fixed costs for materials and subcontractors in addition to petitioner's projected costs for its labor, supplies, and bond costs.  After the bids were submitted, the requesting agency selected the lowest bid and awarded the contract.

In order to submit a bid for construction projects, petitioner was required by law to show that it had obtained the required performance and payment bonds issued by an approved bonding company.  Performance and payment bonds protect the owner

of the construction project by guaranteeing that the contractor will build the project according to the specifications and make all required payments to its subcontractors on the project. Dennis, Curtis, and their wives personally guaranteed all performance and payment bonds issued on behalf of petitioner.

In addition to Dennis and Curtis, petitioner employed 35 persons during 1995 and 41 persons during 1996. Petitioner's office staff consisted of Rodney Olson (Mr. Olson), who was the office manager, and Jane Wagner (Jane), who was Curtis' wife. Other than Dennis, Curtis, Jane, and Mr. Olson, petitioner's remaining employees worked an average of 28.9 weeks in 1995 and 27.3 weeks in 1996.

Petitioner's major construction jobs for 1995 and 1996 were performed throughout northern Minnesota and included jobs located in International Falls, Littlefork, Warroad, Roseau, Greenbush, Crookston, Chisholm, and Ash River. During the construction season, which is generally from May through November in northern Minnesota, petitioner maintained four construction crews.

The Associated General Contractors of Minnesota Highway, Railroad and Heavy Construction Contractors entered into separate agreements with the International Union of Operating Engineers Local No. 49 and the Laborer's District Council of Minnesota and North Dakota on behalf of its affiliated local unions. During the years in issue, petitioner operated under those contracts

with its laborers and operating engineers.  Petitioner paid its laborers and operating engineers the highest wage scale in the State of Minnesota.

C.  Dennis' Responsibilities and Qualifications

By 1995, Dennis had more than 30 years of experience in the construction and logging industries and had been petitioner's president for 10 years.

Dennis prepared, approved, and submitted bids for contract work.  He was responsible for securing contracts at a profit sufficient to keep petitioner's four construction crews active throughout the construction season in northern Minnesota.  He selected bonding companies, consulting engineers, investment firms, attorneys, and accountants.  Dennis negotiated the union contracts and the employee fringe benefit plans.  He was responsible for addressing all complaints and concerns about the daily operations of the company.

Dennis was also responsible for the final decisions on the purchase of major assets.  Dennis approved all subcontract payments and verified that all subcontractor deficiencies were corrected.  He was responsible for negotiating all financing arrangements and equipment rental rates.  Dennis made the final decision on when to purchase and select stocks, securities, and investments.  He negotiated all private business contracts and made the final decision on billings and collections.

Dennis attended bid lettings, prebid showings, job meetings, and inspections, prepared job schedules, and worked with project engineers on payment schedules, job problems, and change orders. He was the primary contact person between petitioner and all regulatory or governmental agencies.

Further, Dennis was responsible for dispatching equipment with the operators. He managed construction projects by supervising all projects on a regular basis. He also supervised the company's maintenance shop and the maintenance, repair, and certification of petitioner's large fleet of machinery and equipment. Dennis supervised all sand and gravel operations, wood storage, and dump-site operators employed by the company. He hired personnel, scheduled layoffs, and determined pay raises and bonuses. Dennis negotiated all subcontract arrangements and supervised the subcontractor's performance. He made change orders and approved all extra work or deductions on projects. Dennis secured all permits and licenses necessary for the company to conduct its businesses. He could operate all equipment owned by the company and would fill in as needed to operate equipment, drive trucks, or work as a laborer.

Dennis devoted all his work activity to petitioner and worked long hours, 6 or 7 days a week.

Dennis diversified petitioner's operations in order to provide year-round employment for employees, to use equipment more efficiently, and to increase earnings.

Dennis bought or leased property to store and dispose of waste construction materials generated in connection with petitioner's construction contracts.  He began recycling construction waste materials for use in its sand and gravel pit operations, for use as materials in other construction projects, and for sale to third parties.

Dennis negotiated petitioner's logging contracts and purchase rights directly with property owners.  He began using real estate, originally purchased to store and dispose of construction waste, as a storage yard in petitioner's logging operations and also for log storage for third parties.

D.  Curtis' Responsibilities and Qualifications

After graduating from high school in 1973, Curtis began working for his father in the construction and logging businesses.  By 1995, he had more than 20 years of experience in the construction and logging businesses and had been petitioner's vice president for 10 years.

Curtis supervised petitioner's major construction projects in and around International Falls, Minnesota.  In addition, he regularly consulted with the other construction foremen via the radio or mobile telephone, giving technical assistance with other

construction projects. Curtis was petitioner's most skilled equipment operator. He operated the largest heavy equipment daily and recommended maintenance policies. He recommended and assisted with petitioner's equipment purchase decisions. Curtis supervised petitioner's winter logging operations. Since 1985, Boise Cascade Corp. has awarded numerous logging contracts to petitioner. These contracts were the direct result of Curtis' effective management and supervision of the logging operation.

Curtis devoted all his work activity to petitioner and worked long hours, 6 or 7 days a week.

E. Salaries, Bonuses, and Profit-Sharing Contributions Paid by Petitioner to Dennis and Curtis

From 1986 to 1996, petitioner paid annual salaries, bonuses, and profit-sharing contributions to Dennis and Curtis as follows:[2]

---

[2]These amounts were stipulated by the parties as being paid during the "taxable" year. Petitioner reported all amounts paid to Dennis and Curtis as compensation during the calendar years 1985 through 1996 on Forms W-2, Wage and Tax Statement. The stipulated amounts vary slightly from the amounts reported on the Forms W-2 as paid during the calendar year but vary in much greater amounts than reported on petitioner's Federal income tax returns as compensation paid to officers during the taxable (fiscal) year.

### Dennis Wagner

| Year | Salary | Bonus | Profit-Sharing Contribution | Total |
|------|--------|-------|-----------------------------|-------|
| 1986 | $51,810 | $82,500 | $20,146 | $154,456 |
| 1987 | 40,456 | -0- | 6,096 | 46,552 |
| 1988 | 40,456 | 33,750 | 11,131 | 85,337 |
| 1989 | 40,456 | 120,000 | 24,068 | 184,524 |
| 1990 | 42,239 | 165,000 | 30,000 | 237,239 |
| 1991 | 45,050 | 700,000 | 30,000 | 775,050 |
| 1992 | 43,350 | 550,000 | 30,000 | 623,350 |
| 1993 | 44,720 | 740,000 | 30,000 | 814,720 |
| 1994 | 44,720 | 800,000 | 30,000 | 874,720 |
| 1995 | 47,528 | 1,000,000 | 22,500 | 1,070,028 |
| 1996 | 49,088 | 650,000 | 22,500 | 721,588 |

### Curtis Wagner

| Year | Salary | Bonus | Profit-Sharing Contribution | Total |
|------|--------|-------|-----------------------------|-------|
| 1986 | $33,190 | $27,500 | $9,103 | $69,793 |
| 1987 | 40,456 | -0- | 6,096 | 46,552 |
| 1988 | 40,456 | 11,250 | 7,756 | 59,462 |
| 1989 | 40,456 | 40,000 | 12,068 | 92,524 |
| 1990 | 42,239 | 55,000 | 14,673 | 111,912 |
| 1991 | 45,050 | 300,000 | 30,000 | 375,050 |
| 1992 | 43,350 | 150,000 | 29,477 | 222,827 |
| 1993 | 44,720 | 160,000 | 30,000 | 234,720 |
| 1994 | 44,720 | 353,333 | 30,000 | 428,053 |
| 1995 | 47,528 | 200,000 | 22,500 | 270,028 |
| 1996 | 49,088 | 350,000 | 22,500 | 421,588 |

Petitioner paid to Dennis and Curtis weekly salaries equal to the highest wage that petitioner paid to its operators.

At the end of each fiscal year from 1986 to 1996, Dennis reviewed financial information with petitioner's accountants. Dennis limited the amount of the bonuses he and Curtis received to ensure that petitioner had sufficient funds to expand its business, purchase needed equipment, pay subcontractors on time, satisfy business creditors and bonding companies, pay top wages

to its employees, and remain profitable.  Dennis and Curtis agreed that bonuses would be paid on a ratio of 3 to 1 with Dennis receiving three times the bonus amount paid to Curtis.[3]

Petitioner generally paid bonuses to Dennis and Curtis in October of the fiscal year to which they related.  No bonuses were paid for the year ending October 31, 1987.  Beginning with the year ending October 31, 1993, a portion of the bonuses, with interest, was paid to Dennis and/or Curtis in the following January.

F.  Petitioner's Officers and Directors

From 1986 to 1996, Dennis, Curtis, and Dennis' wife Wendy served as petitioner's officers and directors.  Dennis was president, Curtis was vice president, and Wendy was secretary/treasurer.

G.  Petitioner's Financial Statements and Federal Income Tax Returns

At all times since its incorporation, petitioner has had a fiscal year and taxable year ending October 31 and has used the accrual method of accounting for financial reporting purposes. Before November 1, 1991, however, petitioner used the cash method of accounting for tax purposes.

---

[3]The stipulated bonus amounts do not reflect the 3-to-1 ratio, in part, because (1) there were differences in the calendar year reporting for Dennis and Curtis and the fiscal year used by petitioner, and (2) in some years, a portion of the bonuses was paid in the following January.

Effective November 1, 1991, petitioner changed its method of accounting for tax purposes from the cash method to the accrual method. Petitioner realized a section 481(a) adjustment of $1,637,156 on account of the change in accounting methods. Petitioner included $409,289 of the adjustment in income in each of the 4 taxable years ending October 31, 1992 through 1995. Since November 1, 1991, petitioner has used the accrual method of accounting for tax purposes and for financial purposes.

Petitioner engaged accountants to prepare financial statements and reports for its operations. For the taxable years ending October 31, 1986 and 1987, the accountant prepared combined financial statements for petitioner and Wagner & Wagner. Those statements show the following balance sheets:

Separate
Partnership/corporation

| Assets | Partnership | Corporation | Combined | Partnership | Corporation | Combined |
|---|---|---|---|---|---|---|
| | | 10/31/86 | | | 10/31/87 | |
| Current assets | $122,128 | $1,060,510 | $1,112,860 | $126,739 | $1,406,116 | $1,571,777 |
| Property and equipment | 315,179 | 19,600 | 334,779 | 437,683 | 18,300 | 455,983 |
| Other assets | 80,918 | 602 | 81,520 | -- | 451 | 451 |
| Total assets | 518,225 | 1,080,712 | 1,529,159 | 564,422 | 1,424,867 | 2,028,211 |
| Liabilities | | | | | | |
| Current liabilities | 224,378 | 581,694 | 736,294 | 220,998 | 848,505 | 1,027,507 |
| Long-term debt | 13,631 | 244,000 | 257,631 | 63,676 | 133,566 | 197,242 |
| Total liabilities | 238,009 | 825,694 | 993,925 | 284,674 | 982,071 | 1,224,749 |
| Stockholders Equity | | | | | | |
| Common stock | -- | 2,000 | -- | -- | 2,000 | -- |
| Paid-in capital | -- | 332,373 | -- | -- | 332,373 | -- |
| Retained earnings | -- | 78,529 | -- | -- | 266,307 | -- |
| Treasury stock | -- | (157,884) | -- | -- | (157,884) | -- |
| Total | -- | 255,018 | 255,018 | -- | 442,796 | 442,796 |
| Partners Equity | 280,216 | -- | 280,216 | 360,666 | -- | 360,666 |
| | | | 535,234 | | | 803,462 |
| Total liabilities and equity | 518,225 | 1,080,712 | 1,529,159 | 645,340 | 1,424,867 | 2,028,211 |

For each of the taxable years ending October 31, 1988 to 1996, the accountants prepared a separate financial statement for petitioner. The financial statements show balance sheets for petitioner for those years as follows:

|                              | 10/31/88    | 10/31/89    | 10/31/90    |
|------------------------------|-------------|-------------|-------------|
| Assets                       |             |             |             |
| Current assets               | $2,060,231  | $2,483,018  | $3,862,379  |
| Property and equipment       | 672,050     | 545,040     | 958,851     |
| Other assets                 | 300         | -0-         | 223,437     |
| Total assets                 | 2,732,581   | 3,028,058   | 5,044,667   |
| Liabilities                  |             |             |             |
| Current liabilities          | 1,496,368   | 1,321,926   | 2,101,079   |
| Long-term debt               | 692,428     | 871,633     | 1,036,257   |
| Total liabilities            | 2,188,796   | 2,193,559   | 3,137,336   |
| Stockholders Equity          |             |             |             |
| Common stock                 | 2,000       | 2,000       | 2,000       |
| Paid-in capital              | 332,372     | 332,372     | 332,372     |
| Retained earnings            | 367,297     | 658,011     | 1,730,843   |
| Treasury stock               | (157,884)   | (157,884)   | (157,884)   |
| Total equity                 | 543,785     | 834,499     | 1,907,331   |
| Total liabilities and equity | 2,732,581   | 3,028,058   | 5,044,667   |

|                              | 10/31/91    | 10/31/92    | 10/31/93    |
|------------------------------|-------------|-------------|-------------|
| Assets                       |             |             |             |
| Current assets               | $3,314,652  | $3,928,507  | $3,471,251  |
| Property and equipment       | 982,165     | 1,292,130   | 973,986     |
| Other assets                 | 223,972     | 221,522     | 193,843     |
| Total assets                 | 4,520,789   | 5,442,159   | 4,639,080   |
| Liabilities                  |             |             |             |
| Current liabilities          | 1,309,273   | 2,080,527   | 1,373,010   |
| Long-term debt               | 969,136     | 396,568     | 223,440     |
| Total liabilities            | 2,278,409   | 2,477,095   | 1,596,450   |
| Stockholders Equity          |             |             |             |
| Common stock                 | 2,000       | 2,000       | 2,000       |
| Paid-in capital              | 332,372     | 332,372     | 332,372     |
| Retained earnings            | 2,065,892   | 2,788,576   | 2,866,142   |
| Treasury stock               | (157,884)   | (157,884)   | (157,884)   |
| Total equity                 | 2,242,380   | 2,965,064   | 3,042,630   |
| Total liabilities and equity | 4,520,789   | 5,442,159   | 4,639,080   |

|                               | 10/31/94    | 10/31/95    | 10/31/96    |
|-------------------------------|-------------|-------------|-------------|
| Assets                        |             |             |             |
| Current assets                | $2,898,541  | $3,584,901  | $3,295,219  |
| Property and equipment        | 877,553     | 1,032,037   | 1,118,592   |
| Other assets                  | 106,309     | 101,710     | 92,286      |
| Total assets                  | 3,882,403   | 4,718,648   | 4,506,097   |
| Liabilities                   |             |             |             |
| Current liabilities           | 827,931     | 1,584,793   | 1,114,378   |
| Long-term debt                | 149,780     | 243,107     | 257,842     |
| Total liabilities             | 977,711     | 1,827,900   | 1,372,220   |
| Stockholders Equity           |             |             |             |
| Common stock                  | 2,000       | 2,000       | 2,000       |
| Paid-in capital               | 332,372     | 332,372     | 332,372     |
| Retained earnings             | 2,728,204   | 2,714,260   | 2,957,389   |
| Treasury stock                | (157,884)   | (157,884)   | (157,884)   |
| Total equity                  | 2,904,692   | 2,890,748   | 3,133,877   |
| Total liabilities and equity  | 3,882,403   | 4,718,648   | 4,506,097   |

From 1986 to 1993, Dennis and Curtis made loans to petitioner, which were unsecured.  The outstanding loan amounts petitioner owed to Dennis and Curtis on the last day of fiscal years ending October 31, as reflected on petitioner's financial statements, were as follows:

| Fiscal Year | Loan Amounts |
|-------------|--------------|
| 1986        | $198,982     |
| 1987        | 131,574      |
| 1988        | 153,484      |
| 1989        | 351,424      |
| 1990        | 547,621      |
| 1991        | 496,838      |
| 1992        | 51,729       |
| 1993        | -0-          |

Petitioner's financial statements and Forms 1120, U.S. Corporation Income Tax Return (Forms 1120 or returns), for the years ending October 31, 1986 through 1996, show the following income:

|  | 10/31/86 | | 10/31/87 | |
| --- | --- | --- | --- | --- |
|  | Financial Statement | Return | Financial Statement | Return |
| General & contract revenue | $2,135,832 | $2,108,148 | $3,666,642 | $3,359,825 |
| Operating expenses | (2,009,634) | (2,005,650) | (3,409,657) | (3,327,492) |
| Income from operations | 126,198 | 102,498 | 256,985 | 32,333 |
| Other income/(loss) | 20,805 | 1,239 | 57,384 | 37,038 |
| Net income before taxes | 147,003 | 103,737 | 314,369 | 69,371 |
| Taxes | (37,689) | (27,469) | (46,141) | (13,481) |
| Net income | 109,314 | 76,268 | 268,228 | 55,890 |
|  | 10/31/88 | | 10/31/89 | |
|  | Financial Statement | Return | Financial Statement | Return |
| General & contract revenue | $4,416,990 | $3,910,680 | $4,423,002 | $4,489,886 |
| Operating expenses | (4,318,785) | (3,847,599) | (3,986,317) | (4,351,131) |
| Income from operations | 98,205 | 63,081 | 436,685 | 138,755 |
| Other income/(loss) | 45,745 | 21,225 | 50,024 | 21,629 |
| Net income before taxes | 143,950 | 84,306 | 486,709 | 160,384 |
| Provision for taxes | (42,960) | (16,914) | (195,995) | (54,825) |
| Net income | 100,990 | 67,392 | 290,714 | 105,559 |
|  | 10/31/90 | | 10/31/91 | |
|  | Financial Statement | Return | Financial Statement | Return |
| General & contract revenue | $6,746,331 | $6,014,515 | $5,156,266 | $5,581,672 |
| Operating expenses | (5,008,338) | (5,269,014) | (4,812,253) | (5,141,657) |
| Income from operations | 1,737,993 | 745,501 | 344,013 | 440,015 |
| Other income/(loss) | 58,139 | 59,876 | 203,106 | 149,527 |
| Net income before taxes | 1,796,132 | 805,377 | 547,119 | 589,542 |
| Provision for taxes | (723,300) | (272,170) | (212,070) | (193,077) |
| Net income | 1,072,832 | 533,207 | 335,049 | 396,465 |
|  | 10/31/92 | | 10/31/93 | |
|  | Financial Statement | Return | Financial Statement | Return |
| General & contract revenue | $7,442,762 | $7,388,353 | $5,090,933 | $5,088,511 |
| Operating expenses | (6,503,283) | (6,809,208) | (4,983,762) | (5,174,854) |
| Income from operations | 939,479 | 579,145 | 107,171 | (86,343) |
| Other income/(loss) | 176,050 | 524,359 | 130,396 | 593,430 |
| Net income before taxes | 1,115,529 | 1,103,504 | 237,567 | 507,087 |
| Provision for taxes | (392,845) | (375,191) | (160,001) | (172,410) |
| Net income | 722,684 | 728,313 | 77,566 | 334,677 |

|                            | 10/31/94 | | 10/31/95 | |
|----------------------------|----------------------|--------------|----------------------|--------------|
|                            | Financial Statement  | Return       | Financial Statement  | Return       |
| General & contract revenue | $4,615,746           | $4,633,752   | $5,312,291           | $5,443,976   |
| Operating expenses         | (4,737,810)          | (4,876,375)  | (5,504,288)          | (5,640,193)  |
| Income from operations     | (122,064)            | (242,623)    | (191,997)            | (196,217)    |
| Other income/(loss)        | (119,795)            | 491,262      | 123,346              | 504,140      |
| Net income before taxes    | (241,859)            | 248,639      | (68,651)             | 307,923      |
| Provision for taxes        | 103,921              | (80,219)     | 54,707               | (103,340)    |
| Net income                 | (137,938)            | 168,420      | (13,944)             | 204,583      |

|                            | 10/31/96 | |
|----------------------------|----------------------|--------------|
|                            | Financial Statement  | Return       |
| General & contract revenue | $6,141,479           | $6,069,677   |
| Operating expenses         | (5,907,484)          | (6,063,715)  |
| Income from operations     | 233,995              | 5,962        |
| Other income/(loss)        | 137,722              | 79,668       |
| Net income before taxes    | 371,717              | 85,630       |
| Provision for taxes        | (128,588)            | (17,364)     |
| Net income                 | 243,129              | 68,266       |

Petitioner's gross receipts/sales, net earnings, and profit before interest and taxes as reflected on its Forms 1120 and financial statements for the years ending October 31, 1986 to 1996, were as follows:

|      | Gross Receipts/Sales | | Net Income/(Loss) | | Profit Before Interest & Taxes | |
|------|-------------|---------------------|----------|---------------------|-------------|---------------------|
| Year | Return      | Financial Statement | Return   | Financial Statement | Return      | Financial Statement |
| 1986 | $2,108,148  | $2,135,832          | $76,268  | $109,314            | $107,882    | $170,099            |
| 1987 | 3,359,825   | 3,666,642           | 55,890   | 268,228             | 91,505      | 355,062             |
| 1988 | 3,910,680   | 4,416,990           | 67,392   | 100,990             | 128,110     | 219,691             |
| 1989 | 4,489,866   | 4,423,002           | 105,559  | 290,714             | 274,428     | 564,877             |
| 1990 | 6,014,515   | 6,746,331           | 533,207  | 1,072,832           | 891,514     | 1,881,196           |
| 1991 | 5,581,672   | 5,156,266           | 396,465  | 335,049             | 686,366     | 643,943             |
| 1992 | 7,388,353   | 7,442,762           | 728,313  | 722,684             | 1,155,251   | 1,187,754           |
| 1993 | 5,088,511   | 5,090,933           | 334,677  | 77,566              | 558,886     | 289,650             |
| 1994 | 4,633,752   | 4,615,746           | 168,420  | (137,938)           | 255,090     | (229,787)           |
| 1995 | 5,443,976   | 5,312,291           | 204,583  | (13,944)            | 340,176     | (32,698)            |
| 1996 | 6,069,677   | 6,141,479           | 68,266   | 243,129             | 126,942     | 417,147             |

Petitioner's financial statements and the Schedules E, Compensation of Officers, of Forms 1120 for the years ending October 31, 1986 through 1996, reported compensation of officers as follows:

| Year | Return Dennis | Return Curtis | Return Total Officer Compensation | Financial Statement Total Officer Compensation |
|------|------|------|------|------|
| 1986 | $134,310 | $60,690 | $195,000 | $195,000 |
| 1987 | 40,641 | 40,641 | 81,282 | 81,282 |
| 1988 | 74,206 | 51,706 | 125,912 | 285,912 |
| 1989 | 160,456 | 80,456 | 240,912 | 243,090 |
| 1990 | 207,239 | 97,239 | 304,478 | 304,478 |
| 1991 | 745,050 | 345,050 | 1,090,100 | 930,100 |
| 1992 | 593,350 | 193,350 | 786,700 | 788,400 |
| 1993 | 784,470 | 204,450 | 988,920 | 988,920 |
| 1994 | 847,109 | 399,260 | 1,246,369 | 1,246,437 |
| 1995 | 1,048,200 | 246,688 | 1,294,888 | 1,293,948 |
| 1996 | 699,192 | 400,573 | 1,099,765 | 1,099,825 |

Since its incorporation in 1985, petitioner has neither paid nor declared any dividends.

Petitioner timely filed its Forms 1120 for the taxable years 1995 and 1996 with the Internal Revenue Service Center at Kansas City, Missouri.  On November 25, 1998, respondent issued a notice of deficiency to petitioner for the taxable years ending October 31, 1995 and 1996.  Respondent's proposed adjustments concerned only the reasonableness of petitioner's total officer compensation payments made to Dennis and Curtis.

OPINION

A. Positions of the Parties

On its Forms 1120, petitioner deducted officer compensation of $1,294,888 ($1,048,200 for Dennis and $246,688 for Curtis) in 1995 and $1,099,765 ($699,192 for Dennis and $400,573 for Curtis) in 1996.  Petitioner contends that the amounts paid to Dennis and Curtis were reasonable and were for services they provided to petitioner.

In the notice of deficiency, respondent disallowed $1,084,719 of the officer compensation deducted in 1995 (allowing $210,169) and disallowed $898,560 deducted in 1996 (allowing $201,205). On brief, respondent now contends that officer compensation in excess of $435,450 ($243,000 paid to Dennis and $192,450 to Curtis) in 1995 and in excess of $460,950 ($258,600 paid to Dennis and $202,350 to Curtis) in 1996 was unreasonable, was disguised dividends, and was not compensation for services Dennis and Curtis rendered to petitioner.

B. Controlling Factors

A taxpayer may deduct payments for compensation if the amount paid is reasonable and for services actually rendered. See sec. 162(a)(1). The reasonableness of compensation is a question of fact that must be answered by comparing each employee's compensation with the value of services that he or she performed in return. See RTS Inv. Corp. v. Commissioner, 877 F.2d 647, 650 (8th Cir. 1989), affg. per curiam T.C. Memo. 1987-98; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). Where, as in this case, the corporation is controlled by the same employees to whom the compensation is paid, there is a lack of arm's-length bargaining. Special scrutiny must be given to bonus payments paid under such

circumstances, because such payments "may be distributions of earnings rather than payments of compensation for services rendered; <u>even if they are reasonable, they would not be deductible</u>." <u>Charles Schneider & Co. v. Commissioner</u>, <u>supra</u> at 153 (emphasis supplied). Nevertheless, the existence of a compensatory purpose can often be inferred if the amount of the compensation is determined to be reasonable. See <u>O.S.C. & Associates, Inc. v. Commissioner</u>, 187 F.3d 1116, 1120 (9th Cir. 1999), affg. T.C. Memo. 1997-300. For that reason, courts generally focus on the reasonableness of the amount of the purported compensation. See <u>id.</u> Courts generally do not delve into whether a compensatory purpose exists unless there is evidence that purported compensation payments, although reasonable in amount, were in fact disguised dividends. See <u>id.</u> "[I]f there <u>is</u> evidence that the payments contain disguised dividends, the corporation must separately satisfy <u>both</u> the reasonableness <u>and</u> the compensatory intent prongs of the test. Reasonableness alone will not suffice." <u>Id.</u> at 1121.

<u>C. Expert Witness Reports</u>

Both parties submitted expert witness reports to establish the amount of compensation paid to Dennis and Curtis that was reasonable. Expert witness reports may help the Court understand an area requiring specialized training, knowledge, or judgment. See <u>Snyder v. Commissioner</u>, 93 T.C. 529, 534 (1989). We may be

selective in deciding what part of an expert witness' report we will accept.  See <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; <u>Parker v. Commissioner</u>, 86 T.C. 547, 561 (1986).

### 1.  Robert F. Reilly

Petitioner presented the report and testimony of Robert F. Reilly (Mr. Reilly), a compensation expert and a business valuation expert from the firm of Willamette Management Associates.

In order to prepare his report, Mr. Reilly reviewed petitioner's Forms 1120 and financial statements covering periods from 1986 to 1996.  He interviewed Dennis and reviewed various documents produced by petitioner, respondent, and third parties to obtain information regarding petitioner and the services provided by Dennis and Curtis.  Mr. Reilly researched the published proxy data of public companies in 1995 and 1996 in an effort to find companies comparable to petitioner but found no specific public companies comparable to petitioner for compensation purposes.  Additionally, he used various surveys to evaluate the compensation paid to Dennis and Curtis in 1995 and 1996.

Mr. Reilly considered developments of petitioner's business from 1986 through 1996, including the following:

(a)  Petitioner won and held onto logging contracts with Boise Cascade Corp.;

(b)  petitioner purchased land (or rented land from Wagner & Wagner) to store construction wastes from its construction operations and for others;

(c)  petitioner converted portions of land from construction waste storage to log storage for its logging operations and those of Boise Cascade Corp.;

(d)  petitioner purchased land and developed sand and gravel pits for use in its construction business and for sale to others;

(e)  petitioner entered into advantageous agreements to extract gravel from other properties for use in its construction business and its sand and gravel operations;

(f)  petitioner's revenues increased from $2.1 million in 1986 to $6.1 million in 1996;

(g)  from 1985 to 1996, both Dennis and Curtis devoted themselves exclusively to petitioner's construction and related businesses, and they worked up to 90 hours per week;

(h)  by 1995, Dennis had more than 30 years of experience and Curtis had more than 20 years of experience in the construction and logging industries; and

(i)  Dennis and Curtis were petitioner's only officers from 1985 to 1996; they performed all the executive and administrative

duties and assumed all the responsibilities for petitioner's operations.

Mr. Reilly based his analysis of compensation paid to Dennis on the duties performed as president and chief executive officer (CEO), chief financial officer, vice president of marketing and sales, and chief operating officer (COO).  Mr. Reilly based his analysis of compensation paid to Curtis on the duties performed as vice president and chief engineering executive, COO (in Dennis' absence), and supervisor of petitioner's logging operations.

Mr. Reilly found that, in his efforts to compare petitioner to other highway and heavy construction companies, petitioner was unique because it had a management team of only two people, Dennis and Curtis, who operated a business with annual revenues between $5 and $6 million.  Petitioner's management structure was comparable to that of highway and heavy construction companies with annual revenues between $1 and $3 million.  Furthermore, in Mr. Reilly's opinion, it would take four people to replace Dennis.  Mr. Reilly also noted, in comparing petitioner to other highway and heavy construction companies of comparable size, that petitioner operates in northern Minnesota where the construction season is very short.  In comparing petitioner's financial information to the published survey data, Mr. Reilly used

petitioner's Forms 1120 for sales figures of $5.4 million in 1995 and $6.1 million in 1996.

Mr. Reilly reviewed the "Almanac of Business and Industrial Financial Ratios" for the period from July 1995 to June 1996, which uses data from the Federal income tax returns of businesses included in the various categories. Mr. Reilly determined that of the nearly 21,000 businesses included in the highway and heavy construction contractor category, 71 percent had total assets of less than $1 million, fewer than 10 percent had total assets in excess of $5 million, 62 percent had a positive net income, and 38 percent of the companies showed a loss in 1995 and 1996.

Mr. Reilly concluded that petitioner's Forms 1120 showed a profit every year from 1986 to 1996. Mr. Reilly viewed petitioner's financial record over 10 years because, in his opinion, examining only 2 years would not take into account prior undercompensation of executives. Further, in his opinion, a company's historical record is the best way to determine whether a company has provided a fair return to its stockholders.

Mr. Reilly, using the "CFMA's 1996 Construction Industry Annual Financial Survey" (the CFMA survey), calculated that highway and heavy construction contractors with revenue under $10 million reported a net income (or after-tax profit margin) percentage of 2.3 percent for 1995 and 0.3 percent for 1996. The record does not indicate whether the CFMA survey used data from

financial statements or tax returns.  On the basis of the income reported on petitioner's Forms 1120, Mr. Reilly calculated that petitioner had a net income percentage (or after-tax profit margin) of 3.8 percent for 1995 and 1.1 percent for 1996.

Mr. Reilly did not compare compensation paid to Dennis and Curtis to that paid to petitioner's other employees because no other employee held an administrative or executive position.  Mr. Reilly observed that petitioner maintained a profit-sharing plan that included other employees, and the union employees were paid top scale wages for the State of Minnesota rather than the specific region governed by petitioner's union contracts.

Mr. Reilly performed two separate analyses of petitioner's executive compensation for purposes of determining a range of reasonable compensation.

Mr. Reilly first compared the executive compensation of Dennis and Curtis to published executive compensation study figures for positions in companies that, in his opinion, were of comparable size and in comparable industries.  He used annual compensation surveys from the National Institute of Business Management (the NIBM survey) and Aspen Publishers, Inc. (the Aspen survey).  The NIBM survey covers companies in the construction, contracting, and extraction industries with annual sales exceeding $5 million.  There is no upper limit on the sales volume of companies included in the survey segment and,

accordingly, the survey segment could include companies with sales of as much as $500 million.

Mr. Reilly also used Watson Wyatt Data Services (Watson Wyatt), which publishes an annual regression analysis report on top management compensation. The Watson Wyatt data includes data for the general services sector; this sector includes all service industries except banking, insurance, and financial services and is not limited to the construction industry. For each position reported, Watson Wyatt provides equations used to calculate a predicted mean total compensation as a function of sales or stockholders equity. In addition, the log of the standard deviation provided with each equation allows for the calculation of predicted total compensation at different percentiles.

The median and high compensation of executives reported for 1995 and 1996 by the NIBM survey, the Aspen survey, and the Watson Wyatt computation (calculated on the basis of shareholder equity of $2,904,691 at the beginning of 1995 and $2,890,745 at the beginning of 1996) is as follows:

| | NIBM Survey | | Aspen Survey | | Watson Wyatt Data | |
| --- | --- | --- | --- | --- | --- | --- |
| Year/Position | Median | 75th Percentile | Median | 3rd Quartile | Median | 84th Percentile |
| 1995 | | | | | | |
| CEO/president | $203,000 | $300,000 | $215,000 | $386,000 | $220,190 | $378,180 |
| Marketing | 95,000 | 134,000 | 73,000 | 120,000 | 110,659 | 164,319 |
| Finance | 97,000 | 150,000 | 73,000 | 110,000 | 108,194 | 170,766 |
| COO/manufacturing | 94,000 | 147,500 | 194,000 | 222,000 | 176,470 | 248,296 |
| Engineering/production | 81,450 | 125,000 | 74,000 | 111,000 | 93,513 | 127,666 |
| 1996 | | | | | | |
| CEO/president | 160,787 | 239,000 | 140,000 | 299,000 | 224,427 | 385,456 |
| Marketing | 80,600 | 122,190 | 69,000 | 74,000 | 112,162 | 166,550 |
| Finance | 97,392 | 125,000 | 64,000 | 72,000 | 109,955 | 173,547 |
| COO/manufacturing | 106,000 | 150,000 | 115,000 | 870,000 | 179,169 | 252,095 |
| Engineering/production | 140,200 | 157,000 | 79,000 | 98,000 | 94,218 | 128,628 |

Using the NIBM survey, the Aspen survey, and the Watson Wyatt data and not taking into account any undercompensation in prior years, Mr. Reilly computed the upper range of reasonable compensation for Dennis and Curtis in 1995 and 1996. In computing the compensation for Dennis, Mr. Reilly added the compensation for the CEO, highest marketing position, highest financial position, and the COO, and then subtracted 25 percent of the COO position (which he allocated to Curtis). In computing the compensation for Curtis, Mr. Reilly added to the compensation for the top engineering position 25 percent of the compensation for the COO. On the basis of those computations, Mr. Reilly's opinion is that the upper range of reasonable compensation for Dennis was between $694,625 and $899,487 for 1995 and between $598,690 and $1,097,500 for 1996. The reasonable compensation for Curtis was between $161,875 and $189,740 for 1995 and between

$191,652 and $315,500 for 1996.

We do not accept certain aspects of Mr. Reilly's analysis. Mr. Reilly's aggregation approach would result in compensation equal to that of four full-time corporate executives. We reject Mr. Reilly's suggestion that Dennis performed the work of four full-time executives serving as petitioner's president and CEO, chief financial officer, vice president of marketing and sales, and COO. Although Dennis may have performed some of the duties and functions of four such executives, he did not perform work equal to the full-time services of four such executives. Although the more roles or functions an employee performs the more valuable his services are likely to be, an employee who performs four jobs, each on a part-time basis, is not necessarily worth as much to a company as four employees each working full time at one of those jobs.

Dennis testified that he worked 80 to 90 hours per week. Four full-time employees would have worked at least 160 combined hours each week. It is therefore inappropriate to aggregate the normal full-time salary for four jobs to compute the reasonable compensation of the employee who fills all four of them. See Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 569 (1974), affd. 528 F.2d 176 (10th Cir. 1975); Richlands Med. Association v. Commissioner, T.C. Memo. 1990-660, affd. without published opinion 953 F.2d 639 (4th Cir. 1992); Ken Miller Supply, Inc. v. Commissioner, T.C. Memo. 1978-228.

We also find questionable some of the data from the surveys Mr. Reilly used in forming his opinion. For example, Mr. Reilly opined that reasonable compensation for Dennis was between $598,690 and $1,097,500 for 1996. The $1,097,500 results in large part from the use of data from the Aspen survey. Specifically, Mr. Reilly used annual compensation for a COO of $870,000 reported in the Aspen survey for the third quartile amount. The third quartile compensation was computed on the basis of information reported by only three incumbents for the COO category.[4] The average amount was $132,000 and the median was $115,000. It is clear therefore that the $870,000 of the third quartile was reported by one incumbent. One company reporting in the $2 to $5 million of sales category also reported $870,000. The $870,000 reported by the two companies is substantially out of line with all other companies reporting COO compensation in all categories. Therefore, we do not find the $870,000 to be reliable.

We also find that Mr. Reilly's use of the income data from petitioner's Forms 1120 for the 2 years at issue in his analysis was inherently flawed because of the distortion caused by the section 481(a) adjustment. The adjustment resulted from petitioner's change in accounting methods in 1991. Before

---

[4]The survey notes that where fewer than three incumbents report in a given category, median, first quartile, and third quartile information is not statistically relevant.

November 1, 1991, petitioner used the cash method of accounting for tax purposes. Effective November 1, 1991, petitioner changed its method of accounting for tax purposes from the cash method to the accrual method. As a result of the change in accounting method, petitioner realized a section 481(a) adjustment of $1,637,156 and included $409,289 of the adjustment in income for each of the 4 taxable years ending October 31, 1992 through 1995. Thus, the section 481(a) adjustment affected the taxable year 1995 and artificially increased petitioner's income by $409,289 for that year.

Mr. Reilly's second analysis estimated the reasonableness of petitioner's executive compensation by calculating petitioner's residual economic income after a fair return on the total fair market value of the stockholders' invested capital. In order to assess the reasonableness of executive compensation under this method, Mr. Reilly allocated to management all the profits in excess of a fair return on the total fair market value of the stockholders' invested capital.

Mr. Reilly estimated that, over the period from 1987 to 1996, a fair before-tax annual rate of return on petitioner's common stock would vary year to year from 26.0 percent to 32.7 percent. Mr. Reilly's estimated fair return was 28.2 percent for 1995 and 26 percent for 1996. Mr. Reilly calculated an estimated value of invested capital in each year and increased the value by

the fair after-tax return from year to year, representing the increase in theoretical retained earnings from October 31, 1985 through 1996, if a fair return was earned in each year through 1996 but no dividends were paid.

Mr. Reilly then added the actual executive compensation paid to income before taxes in order to calculate the amount available to pay a fair return on invested capital and compensation to officers. Mr. Reilly used the income and executive compensation reported on petitioner's Forms 1120. He then subtracted from this subtotal a fair return on the stockholders' invested capital. Under Mr. Reilly's analysis, the remainder (residual) represents the amount available to pay the company's officers as compensation for the results of their managerial efforts. Mr. Reilly then calculated the difference between the amount available to pay petitioner's officers and the actual officers' compensation, which, in his opinion, represented the undercompensation or overcompensation in each year.

Mr. Reilly calculated the amount of undercompensation or overcompensation for the taxable years ending October 31, 1987 through 1996, as follows:

|  | 10/31/1987 | 10/31/1988 | 10/31/1989 | 10/31/1990 | 10/31/1991 |
|---|---|---|---|---|---|
| After-tax rate of return | 17.5% | 19.57% | 21.61% | 20.29% | 20.72% |
| Taxable income plus officers' compensation | $150,653 | $210,218 | $401,296 | $1,109,855 | $1,679,642 |
| Fair return on capital |  |  |  |  |  |
|   Value begin year | 315,766 | 370,993 | 443,716 | 539,478 | 648,787 |
|   Pretax rate of return[1] | 26.5% | 29.7% | 32.7% | 30.7% | 31.4% |
|   Fair pretax return | 83,678 | 110,185 | 145,095 | 165,620 | 203,719 |
| Available for officers' compensation | 66,975 | 100,033 | 256,201 | 944,235 | 1,475,923 |
| Actual compensation | 81,282 | 125,912 | 240,912 | 304,478 | 1,090,100 |
| Under/(over) compensation | (14,307) | (25,879) | 15,289 | 639,757 | 385,823 |
| Cumulative under/(over) compensation | (14,307) | (40,186) | (24,897) | 614,860 | 1,000,683 |

|  | 10/31/1992 | 10/31/1993 | 10/31/1994 | 10/31/1995 | 10/31/1996 |
|---|---|---|---|---|---|
| After-tax rate of return | 19.76% | 19.67% | 17.59% | 18.60% | 17.18% |
| Taxable income plus officers' compensation | 1,890,204 | 1,496,007 | 1,495,008 | 1,602,811 | 1,185,395 |
| Fair return on capital |  |  |  |  |  |
|   Value begin year | 783,242 | 937,807 | 1,122,255 | 1,320,019 | 1,565,701 |
|   Pretax rate of return[1] | 29.9% | 29.8% | 26.7% | 28.2% | 26.0% |
|   Fair pretax return | 234,189 | 279,467 | 299,642 | 372,245 | 407,082 |
| Available for officers' compensation | 1,656,015 | 1,216,540 | 1,195,366 | 1,230,566 | 778,313 |
| Actual compensation | 786,700 | 988,920 | 1,246,369 | 1,294,888 | 1,099,765 |
| Under/(over) compensation | 869,315 | 227,620 | (51,003) | (64,322) | (321,452) |
| Cumulative under/(over) compensation | 1,869,997 | 2,097,618 | 2,046,615 | 1,982,293 | 1,660,840 |

[1]Pretax rate of return divided by 34 percent Federal tax rate.

Mr. Reilly concluded that the total amount available as reasonable compensation for Dennis and Curtis, as indicated by the residual from a fair return of invested capital analysis, was $1,230,566 for 1995 and $778,313 for 1996.

Mr. Reilly combined the results of his two analyses and found that the upper end of the range of reasonable combined compensation for Dennis and Curtis was approximately $1.2 million for 1995 and $1.1 million for 1996, without any adjustment for undercompensation in prior years. Mr. Reilly concluded that Dennis and Curtis were undercompensated by more than $2 million for the period from 1986 to 1994.

We question Mr. Reilly's use of his fair return on invested capital analysis to show that Dennis and Curtis were undercompensated in prior years. An executive has not been undercompensated simply because the stockholders received an excellent return on invested capital that greatly exceeds a "fair" return. As Mr. Reilly acknowledged, a fair return on invested capital is the minimum a stockholder would expect and demand; a stockholder who has not received such a return will either replace management or sell the stock.

Mr. Reilly's use of the cumulative excess amounts over a 10-year period created a distortion that was merely an attempt to justify payments in excess of the maximum Mr. Reilly could compute using his other methods. The Court notes that Mr. Reilly

used a hypothetical investment in capital for purposes of computing a fair return on the capital. Use of the hypothetical investment in capital resulted in a smaller fair return for most years. The smaller fair return resulted in a larger excess, which Mr. Reilly accumulated and used as the amount of undercompensation. Mr. Reilly used the more realistic stockholders equity shown on petitioner's Forms 1120, however, to compute compensation using the Watson Wyatt formula. We reject this inconsistency.

As an additional analysis, Mr. Reilly calculated the average compound annual returns to petitioner's stockholders. He used $315,766 (approximately twice the price petitioner paid for Clifford's 1,000 shares of stock) as the value of the stockholders' initial investment on October 31, 1986, and three different measures of petitioner's stockholders equity. Using his fair return of invested capital analysis and the estimated value of $1,834,375 as of October 31, 1996, Mr. Reilly calculated that the average annual after-tax return over the 10-year period from 1986 to 1996 was 19.24 percent. Using the $3,133,877 book value of stockholders equity as of October 31, 1996, Mr. Reilly calculated that the average annual after-tax return over the 10-year period was 25.80 percent. Finally, using the $1,150,000 purchase price Dennis paid to Curtis for his 25 percent of petitioner's stock in November 1997 to determine an estimated

value of $4.6 million for all of petitioner's stock as of that date, Mr. Reilly calculated that the average annual after-tax return over the 11-year period was 27.57 percent.

We question Mr. Reilly's use of $315,766 as the value of the stockholders' initial capital investment on October 31, 1986. The purchase of Clifford's shares of stock was not the result of an arm's-length negotiation and was made in conjunction with Dennis' transfer of 25 percent of his stock to Curtis and with the gratuitous transfer of Clifford's interest in Wagner & Wagner to Dennis and Curtis.

We also give little weight to the use of the purchase price Dennis paid to Curtis for his 25 percent of petitioner's stock in November 1997. The sale occurred after the years in issue, and the full terms of the purchase are not in evidence.[5]

2.  John M. Lacey

Respondent offered the report and testimony of John M. Lacey, Ph.D. (Dr. Lacey), to establish that petitioner's return on equity for 1995 and 1996 was not comparable to that of the industry and would not meet a reasonable investor's expectations, and to establish that petitioner did not fairly distribute its earnings between management and stockholders.

---

[5]At trial, petitioner objected in another context to the admission of facts related to events occurring after the years before the Court.

To determine the reasonableness of the return on equity, Dr. Lacey compared petitioner's returns on equity for 1995 and 1996 with those of publicly traded companies in the construction industry for the same years. Dr. Lacey found 19 publicly traded companies in the highway and heavy construction industry. He excluded seven companies for one or more of the following reasons:

(1) The company's annual sales exceeded $5 billion;

(2) a large portion of the company's operations were conducted outside the United States;

(3) the company made large acquisitions during the relevant period;

(4) the company reported negative equity, indicating insolvency;

(5) construction was not the company's primary business;

(6) the company had material expense for settlement of contract claims and unapproved change orders.

The 12 remaining companies that Dr. Lacey used to compare to petitioner included Amerilink Corp. (AmC), Atkinson, G.F. Co. (AtC), Dycom Industries, Inc. (DII), Foster Wheeler (FW), Goldfield Corp. (GoC), Granite Construction (GrC), Insituform Technologies (IT), Jacobs Engineering (JE), Mastec Inc. (MI), Meadow Valley Corp. (MV), MYR Group (MG), and Utilx Corp. (UC).

In making his comparisons, Dr. Lacey used the following data for petitioner and the publicly traded companies:

| | Sales | | Gross Profit | | Recalculated Net Income | | Equity | | Return on Equity | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Dollar Amounts in Millions | | | | | |
| | 1995 | 1996 | 1995 | 1996 | 1995 | 1996 | 1995 | 1996 | 1995 | 1996 |
| Comparables: | | | | | | | | | | |
| AmC | $47.54 | $56.06 | $15.68 | $17.11 | $1.45 | $0.46 | $8.75 | $9.21 | 16.6% | 5.0% |
| AtC | 417.00 | 468.47 | 39.17 | 44.25 | 3.61 | 5.02 | 83.46 | 89.28 | 4.3 | 5.6 |
| DII | 143.91 | 143.93 | 26.17 | 28.20 | 4.43 | 6.39 | 11.19 | 17.78 | 39.6 | 35.9 |
| FW | 3,042.18 | 4,005.50 | 399.89 | 494.53 | 83.14 | 111.42 | 625.87 | 688.96 | 13.3 | 16.2 |
| GoC | 12.77 | 13.16 | 0.70 | 1.29 | (0.68) | (0.34) | 12.47 | 12.10 | -5.4 | -2.8 |
| GrC | 894.80 | 928.80 | 111.96 | 110.66 | 28.54 | 27.35 | 209.91 | 233.61 | 13.6 | 11.7 |
| IT | 272.20 | 289.93 | 89.92 | 88.71 | 14.85 | 11.37 | 116.81 | 123.20 | 12.7 | 9.2 |
| JE | 1,723.06 | 1,798.97 | 189.23 | 208.06 | 32.24 | 40.36 | 238.76 | 283.39 | 13.5 | 14.2 |
| MI | 174.58 | 472.80 | 43.82 | 120.47 | 19.79 | 30.08 | 50.50 | 103.50 | 39.2 | 29.1 |
| MV | 90.05 | 133.72 | 4.35 | 2.81 | 1.23 | (0.09) | 11.76 | 11.68 | 10.5 | -0.7 |
| MG | 266.97 | 310.58 | 29.55 | 31.64 | 3.43 | 3.97 | 26.62 | 29.57 | 12.9 | 13.4 |
| UC | 49.72 | 48.99 | 6.74 | 6.41 | (2.02) | (4.49) | 28.07 | 23.46 | -7.2 | -19.1 |
| | | | | | | | | | | |
| Average | 594.56 | 722.58 | 79.76 | 96.18 | 15.83 | 19.29 | 118.68 | 135.48 | 13.6 | 9.8 |
| Median | 220.77 | 300.26 | 34.36 | 37.95 | 4.02 | 5.70 | 39.29 | 59.43 | 13.1 | 10.5 |
| Petitioner | 5.31 | 6.14 | 1.20 | 1.44 | (0.01) | 0.24 | 2.89 | 3.13 | -0.5 | 7.8 |

Dr. Lacey computed the return on equity for 1995 and 1996 for each of the 12 publicly traded companies by dividing "recalculated net income" by common equity. Recalculated net income is net income excluding income from discontinued operations, minority interests, the writeoff of offering costs, and special charges. Dr. Lacey calculated that the median return on equity of the publicly traded companies was a gain of 13.1 percent in 1995 and a gain of 10.5 percent in 1996. In addition, he calculated that the average return was a gain of 13.6 percent in 1995 and 9.8 percent in 1996. He calculated that petitioner's return on equity was a loss of 0.5 percent in 1995 and a gain of 7.8 percent in 1996. Dr. Lacey concluded that petitioner's return on equity would not satisfy the expectation of reasonable investors because it was below the median and average returns for the industry.

In order to assess the fairness of petitioner's division of earnings, Dr. Lacey examined petitioner's distribution among debt holders (in the form of interest expense), executive officers (in the form of bonuses and other compensation), stockholders (in the form of net income, some of which may be paid out currently as dividends), and the Government (in the form of taxes). Dr. Lacey compared petitioner's distribution of its earnings among the four groups to those made by the 12 publicly traded companies.

Using data from the 12 publicly traded companies, Dr. Lacey calculated that the total pool of funds available for distribution among the four groups was equal to operating income plus other income/expense plus management compensation. In calculating management compensation paid by the publicly traded companies, Dr. Lacey included only salaries and bonuses paid to executive officers. He did not include stock options or any other perquisite compensation paid to executive officers of the publicly traded companies or compensation to managers such as supervisors who were not officers.

Dr. Lacey calculated distributable funds, net income distributable to equity holders, and management compensation for the 12 publicly traded companies and petitioner as follows:

| | Distributable Funds | | Net Income/Equity Holders | | | | Management Compensation | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Dollar Amounts in Thousands | | | | | | |
| | 1995 | 1996 | 1995 | | 1996 | | 1995 | | 1996 | |
| Comparables: | | | | | | | | | | |
| AmC | $3,399.84 | $1,750.56 | $1,449.77 | 42.6% | $457.04 | 26.1% | $612.19 | 18.0% | $552.31 | 31.6% |
| AtC | 7,460.96 | 10,241.00 | 3,609.00 | 48.4 | 5,019.00 | 49.0 | 1,806.96 | 24.2 | 1,744.00 | 17.0 |
| DII | 8,510.67 | 10,633.17 | 4,433.20 | 52.1 | 6,390.14 | 60.1 | 994.57 | 11.7 | 1,513.45 | 14.2 |
| FW | 176,540.16 | 214,251.74 | 83,144.00 | 47.1 | 111,416.00 | 52.0 | 3,256.16 | 1.8 | 3,269.74 | 1.5 |
| GoC | (105.10) | 340.18 | (677.56) | 644.7 | (337.84) | -99.3 | 510.46 | -485.7 | 678.02 | 199.3 |
| GrC | 50,336.00 | 49,365.00 | 28,542.00 | 56.7 | 27,348.00 | 55.4 | 1,589.00 | 3.2 | 1,589.00 | 3.2 |
| IT | 26,960.10 | 24,333.89 | 14,850.00 | 55.1 | 11,367.00 | 46.7 | 1,730.10 | 6.4 | 1,758.89 | 7.2 |
| JE | 59,281.82 | 73,718.78 | 32,242.00 | 54.4 | 40,360.00 | 54.7 | 3,684.82 | 6.2 | 4,120.38 | 5.6 |
| MI | 24,087.00 | 60,111.00 | 19,785.00 | 82.1 | 30,083.00 | 50.0 | 1,183.00 | 4.9 | 2,933.00 | 4.9 |
| MV | 3,240.70 | 1,058.73 | 1,232.35 | 38.0 | (85.23) | -8.1 | 342.24 | 10.6 | 553.77 | 52.3 |
| MG | 8,798.35 | 9,657.00 | 3,429.00 | 39.0 | 3,968.00 | 41.1 | 1,311.35 | 14.9 | 1,431.00 | 14.8 |
| UC | (2,173.66) | (1,513.00) | (2,022.00) | 93.0 | (4,489.00) | 296.7 | 748.34 | -34.4 | 985.00 | -65.1 |
| Average | | | | | | | | 10.2 | | 11.1 |
| Median | | | | | | | | 8.5 | | 7.2 |
| Petitioner | | | | | | | | | | |
| | 1,262.99 | 1,516.94 | (13.94) | -1.1 | 243.13 | 16.0 | 1,293.95 | 102.5 | 1,099.83 | 72.5 |

For comparison purposes, Dr. Lacey excluded two companies in 1995 (GoC and UC) and three companies in 1996 (GoC, MV, and UC) because the companies reported losses. Dr. Lacey calculated that petitioner distributed more than 100 percent of its available funds to management (Dennis and Curtis) in 1995 and 72.5 percent in 1996 compared with the remaining publicly traded companies that ranged from 1.8 to 24.2 percent in 1995 and 1.5 to 31.6 percent in 1996. Generally, equity holders received twice as much as management.

Dr. Lacey also reviewed the annual proxy statements filed by the 12 publicly traded companies with the Securities and Exchange Commission. The proxy statements indicate that four of the companies do not have a formal bonus policy. The other eight companies limit the size of the bonuses. For example, five companies limit the bonus to a percentage of the base salary (ranging from 50 to 150 percent). Other companies create a bonus pool determined on the basis of the company's financial performance. Individual officers then receive a portion of the total pool as recommended by top management or the board of directors. One company gives its CEO a bonus equal to 5 percent of the company's operating income above a target level.

Dr. Lacey also used two studies compiled from data submitted for 1995 to compare the bonuses petitioner paid to those paid by other businesses. Dr. Lacey's report does not disclose the range

of the bonuses paid by the other companies. According to one survey, CEO's in the construction industry earned median bonuses equal to 100 percent of their base salaries, and COO's in the construction industry earned median bonuses equal to 53 percent of their base salaries. According to the other survey, CEO's from all industries earned a median bonus equal to 90 percent of their base salaries.

Dr. Lacey compared petitioner to the industry as a whole using two financial ratios derived from the Robert Morris Associates "RMA Annual Statement Studies". He calculated officers', directors', and owners' compensation as a percentage of sales for petitioner and compared the results with the median for highway and heavy construction companies for which data was available. Dr. Lacey calculated that petitioner's percentage of sales ratio (on the basis of compensation paid to Dennis and Curtis) was 24.4 percent in 1995 and 17.9 percent in 1996. He calculated the median ratio for companies in each of the four subcategories in the highway and heavy construction industry and reported that the median ratio for companies doing highway and heavy construction did not exceed 4 percent. The report does not show the range of ratios for companies included in his evaluation.

Dr. Lacey also calculated petitioner's pretax profit as a percentage of tangible net worth and compared the results with

the medians for highway and heavy construction companies. A larger percentage indicates that equity holders receive a higher return, in relation to the book value of their investment in the company. Petitioner's ratio was -2.4 percent in 1995 and 11.9 percent in 1996. The medians for companies in the four subcategories with sales between $1 and $10 million were between 11.2 and 20.4 percent in 1995 and between 11.1 and 19.1 percent in 1996.

Dr. Lacey's analysis has a fatal flaw; none of the 12 publicly traded companies he selected was reasonably comparable to petitioner. All of them were much larger than petitioner, particularly in terms of their respective annual sales. The largest company, FW, had sales of $3.04 billion in 1995 and $4 billion in 1996. The smallest company, GoC, had sales of $12.77 million in 1995 and $13.16 million in 1996. Eight of the companies had gross receipts in excess of $100 million in 1995 and 1996. Another had gross receipts in excess of $90 million in 1995 and $133 million in 1996. Of the three remaining smaller companies (gross receipts between $12 and $50 million), Dr. Lacey eliminated two companies (GoC and UC) from many of his calculations because they showed losses in both 1995 and 1996.

Dr. Lacey concluded that petitioner's return on equity would not satisfy the expectation of a reasonable investor because the return was below the median and average returns of the publicly

traded companies. The returns on equity of the publicly traded companies, however, ranged from a loss of 7.2 percent to a gain of 39.6 percent for 1995 and from a loss of 19.1 percent to a gain of 35.9 percent for 1996. Petitioner's equity showed a loss of 0.5 percent for 1995 and a gain of 7.8 percent for 1996. Of the 12 publicly traded companies, 2 had returns on equity lower than petitioner's in 1995, and 5 had returns lower than petitioner's in 1996. Petitioner's returns on equity were within the range of the returns realized by the publicly traded companies. Thus, without more,[6] comparison to those companies does not show that petitioner's returns on equity would not satisfy the expectation of reasonable investors.

Dr. Lacey opined that the compensation paid to Dennis and Curtis in salaries and bonuses exceeded the 1995 and 1996 total cash compensation of management for the large publicly traded companies he examined. However, as petitioner points out, Dr. Lacey failed to take into account the stock options granted to the executive officers of the publicly traded companies. Top executives at many publicly traded companies typically receive stock options as part of their compensation packages. These stock options can produce substantial compensation in the event

[6]Dr. Lacey offered no evidence that stockholders sold their stock in the corporations reporting losses, that the prices of stock of the companies were lower, or that the corporations replaced management.

that the company's stock price rises greatly.  In at least one other case, the Commissioner conceded that the value of stock options granted to employees in public companies should be considered in determining what like enterprises paid for like services.  See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1330 n.60 (5th Cir. 1987) (experts calculated the average amounts the top three executives could expect to earn in cash and stock options for an outstanding performance), affg. T.C. Memo. 1985-267.  When the compensation paid to Dennis and Curtis is compared with that of other CEO's who did receive options, the options must be considered as part of the compensation packages being used for comparison.  See Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343, affd. 221 F.3d 1091 (9th Cir. 2000).  Accordingly, we reject Dr. Lacey's opinion.

### 3.  Paul A. Katz

Respondent offered the report and testimony of Paul A. Katz (Mr. Katz) for purposes of establishing whether the compensation petitioner paid to Dennis and Curtis in 1995 and 1996 was comparable to that paid for similar positions in the industry. Mr. Katz is a compensation consultant certified by the American Compensation Association.

Mr. Katz compared the compensation paid to Dennis and Curtis in 1995 and 1996 to the median compensation paid in those years to CEO's, and COO's, respectively, as reported by the Economic

Research Institute (ERI).  ERI compiles data from 2,400 surveys
taken by associations, governmental organization, and reports
submitted to the Government.  Mr. Katz analyzed the data for
CEO's[7] and COO's[8] of construction companies with revenues of
approximately $6 million and doing business within 200 miles of
International Falls, Minnesota (but excluding the Minneapolis
area).

Using the ERI data, Mr. Katz calculated that the median
comparable compensation (including bonuses but excluding
benefits) for CEO's and COO's for 1995 and 1996 was as follows:

| Position | 1995 | 1996 |
|----------|------|------|
| CEO | | |
|   Base | $142,800 | $152,400 |
|   Bonus | 19,200 | 20,100 |
|    Total | 162,000 | [1]172,500 |
| COO | | |
|   Base | 99,700 | 106,400 |
|   Bonus | 28,600 | 28,500 |
|    Total | 128,300 | 134,900 |

[1]Mr. Katz incorrectly indicated a total of $172,400 in his
report.

Mr. Katz opined that compensation for comparable positions
can vary as much as 50 percent above or below the median and that
variances greater than 50 percent are generally not considered

---

[7]The ERI survey defines the CEO as the highest ranking and
paid officer in the company with overall responsibility for
directing the running and planning of the company's business
activities.

[8]The ERI survey defines the COO as the second highest
ranking and paid officer in the company with subordinate
responsibility to manage costs and achieve goals.

good compensation practice.  On that basis, Mr. Katz opined that Dennis and Curtis were overpaid by an almost unprecedented amount.  On the basis of Mr. Katz' opinion, respondent contends on brief that compensation petitioner paid to Dennis and Curtis in excess of the following amounts for 1995 and 1996 was unreasonable:

| Position | 1995 | 1996 |
|----------|------|------|
| Dennis (CEO) | $243,000 | $258,600 |
| Curtis (COO) | 192,450 | 202,350 |

Mr. Katz based his analysis of compensation paid to Dennis on the duties performed as the CEO and his analysis of compensation paid to Curtis on the duties performed as the COO. Mr. Katz did not consider any other functions performed by Dennis and Curtis or the number of hours they worked.

We find the report of Mr. Katz to be unreliable.  The report contains several typographical and mathematical errors.  Although some errors were corrected by Mr. Katz' testimony at trial, others were not.  Except for a statement in his report that the median salaries were based on ERI data, the report does not include the ERI data used by Mr. Katz to determine the median salaries and does not indicate the number of corporations, CEO's, or COO's included in the data.  Additionally, although Mr. Katz testified that he looked at the range of compensation to evaluate the quality of the data, the report does not provide a range of compensation amounts from the ERI data.

Finally, Mr. Katz opined that salaries and bonuses paid to Dennis and Curtis were excessive because the compensation exceeded the 1995 and 1996 median <u>cash</u> compensation for CEO's and COO's included in the ERI data. However, Mr. Katz, like Dr. Lacey, failed to take into account the stock options granted to the CEO's and COO's of the publicly traded companies. See <u>Labelgraphics, Inc. v. Commissioner</u>, <u>supra</u>.

Accordingly, we reject Mr. Katz' opinion concerning reasonable compensation paid to Dennis and Curtis for the years at issue.

## D. Rejection of Expert Witness Opinions

Because of fundamental differences in approach among the experts engaged by both parties, the values arrived at in the reports are extremely far apart. Although it is not unusual in valuation cases that two experts reach significantly different conclusions, the reports and testimony of the experts in this case are so dissimilar that the reliability of the experts is brought into question. In this case, the experts reached conclusions that patently favored their respective clients, and their reports were designed to support their conclusions.

The purpose of expert testimony is to assist the trier of fact to understand evidence that will determine the fact in issue. See <u>Laureys v. Commissioner</u>, 92 T.C. 101, 127-129 (1989). That purpose is jeopardized when an expert assumes the position

of an advocate. See id. An expert has a duty to the Court that exceeds his duty to his client; the expert is obligated to present data, analysis, and opinion with detached neutrality and without bias, regardless of the effect of such unbiased presentation on his client's case. See, e.g., Estate of Halas v. Commissioner, 94 T.C. 570, 577-578 (1990). When an expert displays an unyielding allegiance to the party who is paying his or her bill, we generally will disregard that testimony as untrustworthy. See id.; Laureys v. Commissioner, supra; see also Jacobson v. Commissioner, T.C. Memo. 1989-606 (when experts act as advocates, "the experts can be viewed only as hired guns of the side that retained them, and this not only disparages their professional status but precludes their assistance to the Court in reaching a proper and reasonably accurate conclusion"). The experts' lack of impartiality has caused a disservice to the Court and the system of tax administration.

E. Reasonableness of Compensation

We first determine the amount of compensation that was reasonable for petitioner to pay to Dennis and Curtis for their services. In Charles Schneider & Co. v. Commissioner, 500 F.2d at 151-152, the Court of Appeals for the Eight Circuit, to which an appeal in this case would lie, listed the following factors courts consider in assessing the reasonableness of an employee's compensation:

(1) The employee's qualifications;

(2) the nature, extent, and scope of the employee's work;

(3) the size and complexities of the business;

(4) the prevailing general economic conditions;

(5) the prevailing rates of compensation for comparable positions in comparable concerns;

(6) the salary policy of the taxpayer as to all employees;

(7) in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years;

(8) a comparison of salaries paid with the gross income and the net income; and

(9) comparison of salaries with distributions to stockholders.

We carefully scrutinize the facts at hand because Dennis and Curtis, the employees to whom the compensation was paid, control petitioner, the paying corporation.  We must be sure that any amounts purportedly paid as compensation were actually paid for services rendered by Dennis and Curtis, rather than distributions to them of earnings that petitioner could not otherwise deduct.  See Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315-316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; Charles Schneider & Co. v. Commissioner, supra at 152-153.  No single factor controls.  We examine these factors from the

perspective of an independent investor.  See <u>RAPCO, Inc. v. Commissioner</u>, 85 F.3d 950, 954-955 (2d Cir. 1996), affg. T.C. Memo. 1995-128.

### 1. Employee's Qualifications

An employee's superior qualifications for his or her position with the business may justify high compensation.  See <u>Charles Schneider & Co. v. Commissioner</u>, <u>supra</u> at 152; <u>Mayson Manufacturing Co. v. Commissioner</u>, 178 F.2d 115, 121 (6th Cir. 1949); <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. 1142, 1158 (1980).

By 1995, Dennis and Curtis had many years of experience in the construction and logging industries.  During the years at issue, both Dennis and Curtis devoted themselves exclusively to petitioner's business, and they worked up to 90 hours per week. Dennis and Curtis performed all the executive and administrative duties and assumed all the responsibilities for petitioner's operations.  Their experience and knowledge of petitioner's construction, logging, and other diverse business activities made them uniquely qualified for their positions with the business and warrant high compensation.

### 2. Nature, Extent, and Scope of Employee's Work

An employee's position, duties performed, hours worked, and general importance to the success of the company may justify high compensation.  See <u>Charles Schneider & Co. v. Commissioner</u>,

supra; see also Rutter v. Commissioner, 853 F.2d 1267 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Mayson Manufacturing Co. v. Commissioner, supra at 121.  Dennis and Curtis worked long hours, 6 or 7 days a week.  They were petitioner's only officers. Dennis performed all the duties of a CEO, and Curtis performed all duties of a COO.  We view Dennis and Curtis as indispensable to petitioner's various business activities, including highway and heavy construction, logging, construction waste storage, and sand and gravel operations.  Petitioner's growth and prosperity are due directly to the skills, dedication, and efforts of Dennis and Curtis.

We find the nature and scope of the work performed by Dennis and Curtis warrant high compensation.

3. Size and Complexity of Business

We consider the size and complexity of a taxpayer's business in deciding whether compensation is reasonable.  See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1323; Mayson Manufacturing Co. v. Commissioner, supra.  A company's size is measured by its sales, net income, gross receipts, or capital value.  See E. Wagner & Son, Inc. v. Commissioner, 93 F.2d 816, 819 (9th Cir. 1937).

Petitioner's business is more complex than that of many highway and heavy construction companies; petitioner's business also includes logging, construction, waste storage, and sand and

gravel operations. In 1995, petitioner had gross receipts of $5.31 million and capital value of $2.89 million (on the basis of shareholder equity). In 1996, petitioner had gross receipts of $6.14 million and capital value of $3.13 million (on the basis shareholder equity).

We find that the size and complexity of petitioner's business warrants high compensation for its officers.

### 4. General Economic Conditions

General economic conditions may affect a company's performance and thus show the extent of the employee's effect on the company. See Rutter v. Commissioner, supra at 1271; Mayson Manufacturing Co. v. Commissioner, supra at 119. This factor helps to determine whether the success of a business is attributable to general economic conditions, as opposed to the efforts and business acumen of the employee. Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during the bad years. See Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153.

Petitioner's sales increased from $4.62 to $6.14 million during the 2 years at issue. There is no evidence that petitioner's success resulted from general economic conditions. The record shows that petitioner's success resulted in large part from the expertise of Dennis and Curtis and their long hours of hard work.

### 5. Prevailing Rates of Compensation for Comparable Positions in Comparable Companies

In deciding whether compensation is reasonable, we compare it to compensation paid to persons holding comparable positions in comparable companies. See Rutter v. Commissioner, supra at 1271; Mayson Manufacturing Co. v. Commissioner, supra at 119.

Petitioner and respondent rely on their experts' reports and testimony with respect to this factor. We are not persuaded by any of the experts.

Dr. Lacey's report does not provide any data or opinion as to the amount of compensation that would be reasonable for petitioner to pay to Dennis or Curtis. Respondent uses the compensation amounts Mr. Katz concluded were reasonable. Those amounts, however, do not take into account the valuable stock options received by executives of the publicly traded companies. We think that those amounts are less than the amounts that Dennis or Curtis would expect to be paid or that an independent investor would agree to pay for their services.

By contrast, the amounts calculated by Mr. Reilly for Dennis exceed the amounts paid by other companies for four full-time executives, and they are excessive.

On the basis of their value to petitioner's business, we find that an independent investor would agree to pay Dennis, as CEO, the highest amount of reasonable compensation for a CEO and Curtis, as COO, the highest amount of reasonable compensation for

a COO.  Therefore, on the basis of the data that we have found reliable for other companies in the industry contained in Mr. Reilly's report, we find that for both years in issue at least $385,000 is reasonable compensation for Dennis as CEO and at least $250,000 is reasonable for Curtis as COO.

### 6.  Petitioner's Compensation Policy for All Employees

Courts have considered the taxpayer's compensation policy for its other employees in deciding whether compensation is reasonable.  See Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159.  This factor focuses on whether the entity pays top dollar to all employees, including both stockholders and nonstockholders.  See Owensby & Kritikos, Inc. v. Commissioner, supra at 1329-1330.  We look to this factor to determine whether Dennis and Curtis were compensated differently than petitioner's other employees merely because of their status as stockholders. See id.

Petitioner paid its employees the highest wages under the union contracts.  That fact, along with petitioner's success, supports paying Dennis and Curtis the highest salaries for officers.  The salaries paid to Dennis and Curtis were substantially lower than the compensation paid to top executives of other companies.  This supports a finding that part of the bonus was compensation for services rendered during the year.

None of petitioner's employees other than Dennis and Curtis, however, shared in the large distribution of profits petitioner made at yearend. Cf. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159-1160 (compensation paid to the taxpayer's shareholder-employees was reasonable in part because the taxpayer had a longstanding practice of paying all its key employees on the basis of commissions). Thus, petitioner's bonus policy for its nonshareholder employees is not similar to the bonus policy for Dennis and Curtis. Cf. id. Furthermore, the bonuses were paid to Dennis and Curtis in the same proportion as their stockholdings.

This factor indicates that the bonus was in part compensation for services and in part a distribution of profits.

### 7. Compensation Paid in Prior Years

An employer may deduct compensation paid in a year for services rendered in prior years. See Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972). To currently deduct amounts paid as compensation for past undercompensation, a taxpayer must show that it intended to compensate employees for past services from current payments and must establish the amount of past undercompensation. See Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, 95 T.C. at 553-554.

Petitioner contends that parts of the payments to Dennis and Curtis were for services rendered in prior years. Petitioner relies on its expert to establish the amount of past undercompensation. We have rejected Mr. Reilly's calculation of undercompensation paid to Dennis and Curtis from 1986 to 1996. We find that any undercompensation that may have occurred in earlier years was rectified prior to the years at issue. The record does not indicate that the compensation paid to Dennis and Curtis in 1995 and 1996 was attributable to services performed for petitioner in earlier years.

This fact further indicates that part of the bonus was a distribution of profits and not compensation for services.

### 8. Comparison of Salaries Paid With Gross Income and Net Income

Courts have compared compensation to gross and net income in deciding whether compensation is reasonable. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1323; Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115 (6th Cir. 1949). In most cases, considering compensation as a percentage of net income is more probative than considering compensation as a percentage of gross receipts because compensation as a percentage of net income more accurately gauges whether a corporation is disguising the distribution of dividends as compensation. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1325-1326.

According to its financial statements, petitioner had gross receipts of $5,312,291 in 1995 and $6,141,479 in 1996. After payment of compensation, petitioner had a net loss of $13,944 in 1995 and net income of $243,129 in 1996. In 1995, petitioner paid $1,292,888 in officer compensation (or more than 100 percent of petitioner's net income before payment of officer compensation) and 24.4 percent of gross receipts. In 1996, petitioner paid $1,099,765 in officer compensation (or 81.9 percent of petitioner's net income before payment of officer compensation) and 17.9 percent of gross receipts. Although petitioner reported net income of $204,583 on its 1995 Form 1120, the positive net income is attributable in large part to the section 481(a) adjustment that artificially increased petitioner's income by $409,289 for that year.

We think this factor favors respondent for 1995 and is neutral for 1996.

### 9. Comparison of Salary to Distributions to Stockholders and Retained Earnings

The failure to pay more than a minimal amount of dividends may suggest that some of the amounts paid as compensation to the shareholder-employee are dividends. See id. at 1322-1323; Edwin's, Inc. v. United States, 501 F.2d 675, 677 n.5 (7th Cir. 1974); Charles Schneider & Co. v. Commissioner, 500 F.2d 148 (8th Cir. 1974). Corporations, however, are not required to pay dividends; stockholders may be equally content with the

appreciation of their stock if the company retains earnings. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1161.

In reviewing the reasonableness of an employee's compensation, a hypothetical independent investor standard may be used to determine whether a shareholder has received a fair return on investment after the payment of the compensation in question. That leads us to consider whether an independent investor would have approved the compensation in view of the nature and quality of the services performed and the effect of those services on the investor's return on his or her investment. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; see also Summit Sheet Metal Co. v. Commissioner, T.C. Memo. 1996-563.

The prime indicator of the return a corporation is earning for its investors is the return on equity. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1324. In his report, Mr. Reilly provides rates of return that an independent investor would expect to earn on his investment. From 1986 to 1996, the following table shows: (1) The equity shown on petitioner's financial statements; (2) Mr. Reilly's fair after-tax rate of returns on equity that an independent investor would expect to earn; (3) the fair after-tax returns on equity using Mr. Reilly's rates; (4) petitioner's actual after-tax returns on equity; (5)

petitioner's actual after-tax rate of return; and (6) the officers' compensation.

| Year | Year-End Equity | Fair Return Rate | Fair Return | Actual Return | Actual Return Rate | Officers' Compensation |
|------|-----------------|------------------|-------------|---------------|--------------------|-----------------------|
| 1985 | $176,489 | | | | | |
| 1986 | 255,018 | NA | NA | $78,529 | 44.5% | $195,000 |
| 1987 | 442,796 | 17.50% | $44,628 | 187,778 | 73.6 | 81,282 |
| 1988 | 543,785 | 19.57 | 86,655 | 100,990 | 22.8 | 285,912 |
| 1989 | 834,499 | 21.61 | 117,512 | 290,714 | 53.5 | 243,090 |
| 1990 | 1,907,331 | 20.29 | 169,320 | 1,072,832 | 128.6 | 304,478 |
| 1991 | 2,242,380 | 20.72 | 395,199 | 335,049 | 17.6 | 930,100 |
| 1992 | 2,965,064 | 19.76 | 443,094 | 722,684 | 32.2 | 788,400 |
| 1993 | 3,042,630 | 19.67 | 583,228 | 77,566 | 2.6 | 988,920 |
| 1994 | 2,904,692 | 17.59 | 535,199 | (137,938) | -4.5 | 1,246,437 |
| 1995 | 2,890,748 | 18.60 | 569,320 | (13,944) | -0.5 | 1,293,948 |
| 1996 | 3,133,877 | 17.18 | 496,631 | 243,129 | 8.4 | 1,099,825 |

From 1986 to 1992, petitioner's actual after-tax return on equity greatly exceeded the expected fair return on equity, and the increase in petitioner's retained earnings increased the value of its stock. During that period, Dennis and Curtis, in effect, treated the company as a "growth stock", reinvesting earnings to increase the value of their shares in the company. A hypothetical investor would have considered $2,788,575 growth in equity to have been an exceptional performance for the 7-year period from 1986 to 1992 ($176,489 beginning year equity in 1986 to $2,965,064 end of year equity in 1992).

As Mr. Reilly points out in his opinion, Dennis and Curtis kept large amounts of cash in the company in order to build the business. Rather than having the profits distributed to them, they caused petitioner to retain the earnings, in effect,

reinvesting the money in the business.  By the end of the 1992 fiscal year, they had invested $2,965,064 in the business.

From 1993 to 1996, however, the bonuses paid to Dennis and Curtis left petitioner with either an operating loss or a nominal profit.  During the 4-year period from 1993 to 1996, shareholder equity increased by only $168,813 (to $3,133,877 ending year equity in 1996).  Having reinvested profits from earlier years, a hypothetical investor would have considered a return of $168,813 on the $2,965,064 investment to have been an unacceptable performance.

An absence of profits paid to the stockholders as dividends or reinvested in the business as retained profits justifies an inference that some of the purported compensation really represents a distribution of profits.  Paying most of petitioner's taxable income as compensation to its officers from 1993 to 1996 suggests that the distributions to Dennis and Curtis were in part disguised dividends.  See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325.  Although an independent investor might have approved of the very large payments made to Dennis and Curtis in 1993 and 1994 because of the exceptional returns in prior years, we do not think such an investor would forgo profits beyond that period.  We think that an independent investor would not have been satisfied with the large bonuses petitioner paid to Dennis and Curtis in 1995 and 1996, since it

appears that profits were being siphoned out of the company disguised as salary.  See id. at 1327.

The ability to disguise dividends as salary, particularly if the employee is the sole or majority shareholder, or if a large percentage of the compensation is paid as a bonus, may suggest that compensation is not reasonable.  See RAPCO, Inc. v. Commissioner, 85 F.3d at 954.  Payment of bonuses at the end of a tax year when a corporation knows its revenue for the year may enable it to disguise dividends as compensation.  See Owensby & Kritikos, Inc. v. Commissioner, supra at 1329; Estate of Wallace v. Commissioner, 95 T.C. at 555-556.  The large yearend payments made to Dennis and Curtis suggest that part of their compensation was disguised dividends.  See Petro-Chem Mktg. Co. v. United States, 221 Ct. Cl. 211, 602 F.2d 959, 968 (1979); Builders Steel Co. v. Commissioner, 197 F.2d 263, 264 (8th Cir. 1952); Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267; Rich Plan, Inc. v. Commissioner, T.C. Memo. 1978-514.

Whether petitioner in fact intended to pay Dennis and Curtis those amounts as salaries is material because to be deductible under section 162(a)(1) they must be paid for services actually rendered as well as be reasonable in amount.

The following factors indicate that payments to shareholder officers may be disguised dividend distributions rather than payment for services rendered:

(1)  The bonuses were in exact proportion to the officers' stockholdings;

(2)  payments were in lump sums rather than as the services were rendered;

(3)  there was a complete absence of formal dividend distributions by an expanding corporation;

(4)  the system of bonuses was completely unstructured, having no relation to services performed;

(5)  the company's negligible taxable income for 4 consecutive years was an indication that the bonus system was based on funds available rather than on services rendered; and

(6)  bonus payments were made only to the officer-stockholders in proportion to their stockholdings, and not to other employees.

See, e.g., O.S.C. & Associates, Inc. v. Commissioner, 187 F.3d at 1120; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361-362 (9th Cir. 1974), affg. T.C. Memo. 1971-200.

In this case, all the factors indicate that portions of the bonuses were disguised dividends.

F.  Conclusion

We do not think that petitioner intended the relatively small salaries paid to Dennis and Curtis during the year to fully compensate them for their services.  Thus, portions of the bonuses paid to Dennis and Curtis at the end of the year were

intended as compensation for services.  We have found that for both years in issue at least $385,000 is reasonable compensation for Dennis as CEO and at least $250,000 is reasonable for Curtis as COO.  We think another corporation would pay those amounts to Dennis and Curtis for their services.

We do not think, however, that an independent investor would approve salaries in excess of $635,000, unless the investor were receiving at least a fair return on his investment.

Mr. Reilly, petitioner's expert, determined that 28.2 percent would be a fair pre-tax return (18.6 percent after-tax return) on equity in 1995.  For 1995, an independent investor would expect a pre-tax return of $819,123 ($2,904,692 beginning year equity times fair pre-tax return of 28.2 percent).  In 1995, petitioner deducted $1,294,888 as officer compensation and reported a net loss of $13,946.  The $659,888 excess reported as compensation ($1,294,888 less $635,000) is less than the fair return and is, therefore, a nondeductible dividend.

Mr. Reilly determined that 26 percent would be a fair pre-tax return (17.18 percent after-tax return) on equity in 1996. For 1996, an independent investor would expect a pre-tax return of $751,594 ($2,890,748 beginning year equity times fair pre-tax return 26 percent).  In 1996, petitioner deducted $1,099,765 as officer compensation and had retained earnings of $243,132.  The $464,765 excess reported as compensation ($1,099,765 less

$635,000) plus the $243,132 retained earnings equals $707,897. That amount is less than the fair return and is a nondeductible dividend.

We hold that petitioner may deduct $635,000 ($385,000 paid to Dennis plus $250,000 paid to Curtis) as officer compensation in each of the taxable years ending October 31, 1995 and 1996.

<u>Decision will be entered under Rule 155</u>.